**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

|  |  |
|---|---|
| STRIVE SPECIALTIES INC.,<br><br>*Plaintiff,*<br><br>v.<br><br>ELI LILLY & CO.,<br>NOVO NORDISK A/S, and<br>NOVO NORDISK INC.<br><br>*Defendants.* | Case No. 5:26-CV-0155<br><br>JURY TRIAL REQUESTED |

**COMPLAINT**

## I.     INTRODUCTION

1.     The healthcare system in the United States is shifting. Now, more than ever, U.S. patients are pressing for healthcare changes to improve life expectancy, increase access to healthcare, and reduce the risk of crippling medical debt borne by those seeking treatment for themselves and their loved ones.

2.     This healthcare evolution is particularly pronounced in the sale of glucagon-like-peptide-1 agonists ("GLP-1 medicines" or "GLP-1 drugs"). These drugs can revolutionize patients' lives, but because of their cost, they are often unobtainable by those that need them most.

3.     Eli Lilly and Company ("Eli Lilly") and Novo Nordisk A/S and Novo Nordisk Inc. (collectively, "Novo Nordisk") would have the world believe that without

the potential of reaping hundreds of billions of dollars in profits for the sale of GLP-1 drugs, incentives to innovate and compete would be lost, and that exclusivity in the market for GLP-1 medicines serves the greater good.

4.      These assertions are false. Congress passed the Sherman Antitrust Act so that competition rather than monopoly would rule in the United States, and so innovation would spur from rivalry rather than the aggregated wealth of a few. Strive Specialties Inc. ("Strive") sought to compete against Eli Lilly and Novo Nordisk in this very way: by compounding GLP-1 medicines, as authorized under Section 503A of the Federal Food, Drug, and Cosmetic Act (the "FDCA"). Specifically, Strive compounded GLP-1 medicines that were personalized for individual patients according to a medical practitioner's prescription—medicines that Eli Lilly and Novo Nordisk did not offer. Strive produced and sold these compounded GLP-1 medicines at a fraction of the price of the branded GLP-1 medicines manufactured by Eli Lilly and Novo Nordisk.

5.      This generated competition between compounding pharmacies like Strive, on the one hand, and Eli Lilly and Novo Nordisk, on the other. That competition led to the brand manufacturers creating online pharmacies that sell branded GLP-1 drugs at reduced prices. But they do not address the clinical needs of patients that need personalized versions of GLP-1 medicines—a key benefit of compounding—and do not charge lower prices than compounding pharmacies.

6.      But Eli Lilly and Novo Nordisk were not content to compete on the merits with compounding pharmacies. Instead, Eli Lilly and Novo Nordisk entered

exclusive agreements with telehealth providers that barred those telehealth providers from working with compounding pharmacies, cutting off an essential channel between patients with prescriptions for personalized medicines and the pharmacies that could fill those prescriptions.

7.    Additionally, Eli Lilly disparaged compounded products by suggesting that they were somehow "always illegal" despite the practice of compounding being expressly codified in the FDCA and being a recognized and lawful practice since the founding of the United States.

8.    Eli Lilly also sought to interfere in Strive's relationships with third party technology platforms and payment processors, in an effort to censor all statements about compounded medicines' potential benefits and restrict compounding pharmacies' ability to accept payment for their products.

9.    Eli Lilly and Novo Nordisk's conduct is illegal under the United States' antitrust laws. It is meant to preserve their supracompetitive prices by forestalling all competition, no matter how small.

10.    Eli Lilly and Novo Nordisk's conduct has unlawfully restricted competition and directly harmed GLP-1 patients in the United States. As a result, patients are forced to pay inflated prices and suffer reduced access to GLP-1 medicines—particularly personalized versions of those medicines. Strive seeks to restore competition to the world of GLP-1 medicines, allowing patients to benefit from improved access and lower costs.

## II.    <u>PARTIES</u>

11.    Strive Specialties Inc. is a Wyoming corporation that has its headquarters in Gilbert, Arizona. Strive maintains offices located in this District, manufactures compounded GLP-1 medicines in this District, has significant (and growing) sales in this District, employs dozens of workers in this District, and otherwise transacts business here.

12.    Eli Lilly and Company is a corporation organized and existing under the laws of Indiana and has its headquarters in Indianapolis, Indiana. Eli Lilly has a monopolist share of the GLP-1 market in the United States. Eli Lilly advertises and sells its GLP-1 drugs, Mounjaro and Zepbound, in this District and otherwise transacts business here.

13.    Defendant Novo Nordisk A/S is a Danish stock-based corporation (or "aktieselskab") specializing in treatment of chronic diseases, and is headquartered in and organized under the laws of Denmark. It manufactures Ozempic and Wegovy, two of the most prominent GLP-1 drugs on the market and is a market leader in the sale of GLP-1 drugs. Novo Nordisk A/S advertises and sells its GLP-1 drugs, Ozempic and Wegovy, in this District and otherwise transacts business here.

14.    Defendant Novo Nordisk Inc. is a wholly owned subsidiary and the U.S.-based affiliate of Novo Nordisk A/S responsible for carrying out its U.S. operations in part. Novo Nordisk, Inc. is headquartered in New Jersey. Defendant Novo Nordisk Inc., advertises and sells Novo Nordisk A/S's GLP-1 drugs, Ozempic and Wegovy, in this District and otherwise transacts business here.

### III.    JURISDICTION, VENUE, & INTERSTATE COMMERCE

15.    These claims arise under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. This court has subject-matter jurisdiction over this action pursuant to the Clayton Act, 15 U.S.C. §§ 15, 26, and pursuant to 28 U.S.C. § 1331.

16.    Venue is appropriate in this District under 15 U.S.C. §§ 15 and 22, as well 28 U.S.C. § 1391, in that Eli Lilly and Company and both Novo Nordisk A/S and Novo Nordisk Inc. have transacted business in this District, are licensed to do business in this District, and because a significant portion of the affected interstate commerce described in this complaint was carried out in this District. Defendant Novo Nordisk A/S, separately, is not a resident of the United States and may be sued in any judicial district. 28 U.S.C. § 1391(c)(3).

17.    This Court has personal jurisdiction over Eli Lilly and Company and both Novo Nordisk A/S and Novo Nordisk Inc. because each entity: (1) transacts business within this District, (2) has substantial contacts within the United States, including this District, and (3) has engaged in conduct described herein causing injury to persons residing in, located in, or doing business throughout the United States, including this District.

18.    Eli Lilly and Company and both Novo Nordisk A/S and Novo Nordisk Inc. engage in, and their activities substantially affect, interstate trade and commerce. Eli Lilly and Company and both Novo Nordisk A/S and Novo Nordisk Inc. provide products that are marketed, distributed, and offered to consumers throughout the United States, across state lines, and internationally.

## IV.    <u>INDUSTRY BACKGROUND</u>

### A. DEVELOPMENT OF GLP-1 MEDICATIONS

19.    Millions of Americans rely on GLP-1 drugs for a variety of health benefits. These drugs help with weight loss, reduce blood sugar levels and blood pressure, improve lipid disorders and fatty liver disease, decrease risk of heart and kidney disease, and delay progression of diabetes-related kidney issues. They have also been linked to decreased risk of dementia and addiction.

20.    The history of GLP-1 drugs spans more than a century. In 1906 scientists first showed that "incretins"—gut hormones that stimulate insulin secretion—could lower blood sugar. However, with the discovery of insulin, which demanded medical focus and attention, incretins were largely set aside.

21.    Interest in incretins returned in the 1960s as more evidence showed the role they played in regulating insulin levels. The first GLP-1 incretin was discovered in 1986. Subsequent studies showed that glucagon-like peptides in the intestines were released in response to glucose, presenting the possibility that GLP-1s could naturally inhibit the release of glucagon, a hormone that regulates blood sugar.

22.    A year later, studies of GLP-1 incretins demonstrated that small quantities of laboratory-synthesized GLP-1 could trigger insulin production.

23.    Unlike other diabetes treatments, GLP-1s released insulin only when blood sugar levels were high. This "glucose-dependent" action offered a safer alternative to other medicines by reducing the risk of patient hypoglycemia.

24.     Early GLP-1-based treatments thus offered a three-part function of increasing insulin, decreasing glucagon, and implementing a "safety switch" that turned off insulin production when blood sugar levels were low. It is this three-part function that would become the hallmark of modern GLP-1 drugs.

25.     Over time, researchers observed that patients taking GLP-1 drugs experienced significant weight loss. As a result, interest grew in marketing GLP-1 drugs for weight loss.

26.     Early GLP-1 treatments degraded quickly, which limited their effectiveness. Scientists made a breakthrough discovery in the late 1990s when they discovered that Gila monster saliva contained a GLP-1-like compound that degraded much more slowly. That compound facilitated the development of better, more effective GLP-1 drugs.

## B.     ELI LILLY AND NOVO NORDISK'S BRANDED GLP-1 DRUGS

27.     In 2005, the Food the Drug Administration (FDA) issued its first approval of a GLP-1 drug for treatment of type-2 diabetes to Amylin Pharmaceutical and Eli Lilly for Exenatide. That product was marketed as Byetta.

28.     Novo Nordisk also developed a GLP-1 product, semaglutide, which bonded the GLP-1 strain with a fatty acid acetylated compound to create an extended-life product.

29.     Semaglutide was first approved by the FDA in 2017 for the treatment of type-2 diabetes under the brand name Ozempic. In 2021, the FDA approved a Novo

Nordisk Semaglutide product for weight management in adults under the brand name Wegovy.

30.    Meanwhile, Eli Lilly focused its commercialization efforts on a product that acted as a dual analog for GIP (another hormone) and GLP-1 receptors: Tirzepatide. Tirzepatide was approved by the FDA for treatment of type-2 diabetes, under the brand name Mounjaro. Tirzepatide was also later approved by the FDA for weight loss under the brand name Zepbound.

### C.    MONETIZATION OF BRANDED GLP-1 MEDICATIONS

31.    These four modern FDA-approved branded GLP-1 drugs—Ozempic, Wegovy, Mounjaro, and Zepbound—dominate GLP-1 drug sales in the United States.

32.    According to Eli Lilly's quarterly earnings documents, as of the third quarter of 2025, Eli Lilly had a market share of 57.9% of the U.S. branded GLP-1 drug "market," while Novo Nordisk controlled 41.7% of this same "market." Other branded GLP-1 drugs, such as Dulaglutide, Exenatide, and Liraglutide make up less than 1% of the remaining branded "market."



33.     The demand for GLP-1 drugs in the United States has historically been high and remains so today. As of November 2025, 18% of all adults in the United States reported having taken some form of GLP-1 drug and 12% reported currently taking a GLP-1 drug.

34.     GLP-1 drugs are distinct from other drugs used to treat obesity and type-2 diabetes because they have dual mechanisms of action: metabolic control and appetite regulation.

35.     Other drugs generally work by stimulating one or the other. This unique formulation of GLP-1 drugs leads them to have superior efficacy and comparably better side effect profiles. For example, with respect to obesity treatment, GLP-1 drugs typically result in a 15% to 25% reduction in weight after about one year of use.

36.     Eli Lilly and Novo Nordisk recognize that GLP-1 drugs comprise distinct relevant product markets, as illustrated by Eli Lilly and Novo Nordisk's publication of figures showing their GLP-1 market shares in the United States.

37.     Americans faced with a small but significant, non-transitory increase in the price of GLP-1 drugs could not and would not shift to other drug treatments such that the increase in price would be rendered unprofitable.

38.     Indeed, Novo Nordisk consistently raised the price of its GLP-1 drugs (Ozempic and Wegovy) until it faced competition from Eli Lilly's GLP-1 drugs (Zepbound and Mounjaro).

39.     Novo Nordisk did not decrease prices when faced with competition from other non-GLP-1 products.

40.    GLP-1 drugs remain expensive: Eli Lilly's Mounjaro and Zepbound are available at list prices of around $1,000 per month. Novo Nordisk's Ozempic and Wegovy are available at list prices of around $1,000 and $1,350 per month, respectively.

41.    The high costs of branded GLP-1 drugs are unique to the United States.

42.    In September 2024, the U.S. Senate Committee on Health, Education, Labor, and Pensions held a hearing at which the CEO of Novo Nordisk was questioned on the high costs of Ozempic and Wegovy— including the fact that Novo Nordisk sold Ozempic for $87 in Australia but $936 in the United States.

43.    The sale of branded GLP-1 drugs is highly lucrative for Eli Lilly and Novo Nordisk.

44.    In the third quarter of 2025, Eli Lilly's GLP-1 drug sales were $7.2 billion in the United States alone.

45.    The total sales of GLP-1 drugs in the United States are expected to exceed $40 billion in 2025.

46.    Despite the already large size of the U.S. markets for GLP-1 drugs, revenue is only expected to grow. In the third quarter of 2025 total branded GLP-1 prescriptions grew by 36% year-over-year.

47.    Private insurance, Medicare, and Medicaid generally cover GLP-1 drugs when prescribed as a treatment for type-2 diabetes.

48.    Private insurance, Medicare, and Medicaid either heavily restrict the criteria for coverage or do not cover GLP-1 drugs for weight loss at all.

49.    Where insurance coverage for GLP-1 drugs is permitted, it is typically subject to prior authorization and/or limits on body mass index.

50.    Lack of insurance coverage for many weight loss patients means that a robust cash market for GLP-1 drugs has emerged.

51.    This is not a small subset of the U.S. GLP-1 drugs market: one estimate suggests that 19% of all patients using GLP-1 drugs pay for them completely out of pocket.

52.    The only alternatives to Eli Lilly and Novo Nordisk's branded GLP-1 drugs are compounded GLP-1 medications, which are increasingly difficult to obtain due to Eli Lilly and Novo Nordisk's anticompetitive conduct.

### D.    COMPOUNDING PHARMACIES

53.    Compounding pharmacies are specialized pharmacies that prepare custom medications based on individual patient needs. Compounded drugs are not available over the counter and must be provided to a patient pursuant to a prescription from a licensed medical provider.

54.    In other words, compounded forms of GLP-1 medications are only available to a patient when a medical practitioner determines that a tailored or "personalized" version of the medication is in the patient's best interest and prescribes that medication for the individual. Compounded medications are available in different compositions and doses than the branded versions of the drug.

55.    Less than a century ago, compounding was the norm in the pharmaceutical industry. The shift away from compounding did not begin until the

1930s, when Congress enacted the FDCA, which it amended later to forbid marketing of new drugs unless declared effective for their intended use by the FDA.

56.    Before the FDCA's enactment in the 1930s, 75% of prescriptions used some sort of in-pharmacy compounding, which fell to just 1% by 1970s.

57.    The FDCA created a system where bringing drugs to market is often extremely costly and time-intensive. According to Eli Lilly, bringing the average drug to market takes more than ten years and $2.6 billion. The FDCA and the regulatory regime it erected therefore stands as a significant barrier to entry.

58.    The FDCA also creates an approval regime that restricts flexibility in drug formulation. New drugs approved by the FDA have been and continue to be designed for an "average patient."[1] Accordingly, FDA-approved drugs are manufactured with a one-size-fits-most approach that standardizes dosage, delivery method, and other variables. That is to say, FDA testing aims to ensure that drugs are "safe and effective" for the general population represented in clinical trials. Because it prioritizes standardization, the FDA approval process for branded pharmaceuticals was and is ill-equipped to account for individual patient differences.

---

[1] "Most medical treatments are designed for the 'average patient' as a one-size-fits-all approach, which may be successful for some patients but not for others. Precision medicine, sometimes known as 'personalized medicine' is an innovative approach to tailoring disease prevention and treatment that takes into account differences in people's genes, environments, and lifestyles. The goal of precision medicine is to target the right treatments to the right patients at the right time." U.S. FOOD & DRUG ADMIN., "Precision Medicine" (Sept. 27, 2018), available at https://www.fda.gov/medical-devices/in-vitro-diagnostics/precision-medicine#:~:text=Most%20medical%20treatments%20are%20designed,reduce%20exposure%20to%20adverse%20effects.

59.    In this regulatory context, for patients with unique needs that make FDA approved medications unsuitable (allergies, aversion to methods of delivery, etc.), compounded drugs have been called "a godsend."

60.    Licensed healthcare professionals determine when and whether a patient's particular circumstances create a need for compounded medicine. If, in his or her medical judgment, a licensed prescriber determines that an FDA approved drug does not suit the medical needs of a patient, that doctor can prescribe compounded medicine.

61.    The FDA regulates compounding pharmacies under Section 503A of the FDCA, 21 U.S.C. § 353(a). The FDA permits compounding pharmacies to dispense drugs when a prescriber determines that a compounded product is necessary for an identified individual patient.

62.    Congress enacted Section 503A of the FDCA to guarantee that individualized compounded medicines were available to patients that needed them.

63.    Under Section 503A, the FDA regulates and inspects compounding pharmacies' drug production processes.

64.    As state-licensed entities, compounding pharmacies are also regulated and inspected by state boards of pharmacy.

65.    Compounding pharmacies are required to use pharmaceutical grade materials from FDA-registered facilities.

66.    In practice, branded drug manufacturers and compounding pharmacies generally obtain active pharmaceutical ingredients (APIs) from the same sources: FDA-registered drug manufacturers.

67.    Thus, although compounded drugs do not go through the exact same FDA premarket approval process as branded drugs manufactured by drug companies, compounded drugs and the pharmacies that compound them are thoroughly regulated by federal and state regulators.

## V.    RISE OF COMPOUNDED GLP-1 MEDICATIONS

68.    Two recent trends—(1) increasing demand from prescribers and patients for compounded medications, and (2) the parallel rise of telehealth providers—have allowed for the emergence of compounding pharmacies licensed to dispense nationwide, moving from relatively niche players to businesses of substantial size, with the scale to dispense medication in all fifty states.

### A.    PRESCRIBER AND PATIENT DEMAND FOR PERSONALIZED MEDICINES

69.    Whenever a compounded 503A medicine is prescribed, it is because a licensed medical practitioner has used his or her medical judgment to determine that the compounded medicine—and not the FDA approved version—is in the best medical interests of a patient.

70.    There are many reasons that a licensed physician might prescribe compounded medicine. For example, the commercially available version may not come in a dosage that would benefit the patient, or the patient may be allergic to an ingredient in the branded version. Other common reasons that doctors prescribe

14

compounded medicine are that the patient would benefit from a different means of application or delivery than the branded version makes available, or the treatment for a particular patient may involve a combination of drugs that is better prepared in compounded form.

71. Prescriber and patient demand for personalized medicine, such as compounded drugs, has increased as an alternative to the branded pharmaceutical "one-size-fits-most" approach.

72. This trend has been particularly pronounced for GLP-1 drugs.

73. Although compounded GLP-1 drugs contain API from the same FDA-registered "Green List" facilities that supply API for branded GLP-1 drugs, the compounded drugs are typically prescribed in lower doses than those available from Eli Lilly and Novo Nordisk and/or in combination with other medications that a licensed physician believes would benefit the patient. Lower dosages and combination products, for example, are often prescribed to mitigate side effects or adverse events for patients that may be susceptible to them.

74. Patients cannot change the dosage of branded GLP-1 drugs or combine them with other drugs because they are sold only in pre-filled injection pens or single-size pills. Compounding is the only way for a patient with non-standard dosage or combination-product requirements to obtain GLP-1 drugs that meet their needs.

75. Licensed prescribers' increasing recognition of the inability of Eli Lilly and Novo Nordisk's FDA approved products to effectively meet individualized patient needs has led to a rise in prescriptions for compounded GLP-1 drugs.

### B.    RISE OF TELEHEALTH PROVIDERS

76.    Telehealth has grown significantly in the last fifteen years, due in part to provisions in the Affordable Care Act that required insurance coverage for telehealth services, and the American Recovery and Reinvestment Act, which allocated substantial funding to telemedicine following the 2008 recession.

77.    During the COVID-19 pandemic, Congress made changes to Medicare restrictions on where telemedicine must originate, what services would be reimbursed, and the platforms that could be used. State and private insurance payors followed suit.

78.    These changes, and increased patient demand for telehealth appointments during the COVID-19 pandemic, led to a massive increase in patient use of telehealth channels.

79.    Major telehealth providers, including Teladoc Health, Hims & Hers, Ro, LifeMD, Weight Watchers, and Noom Med grew substantially by focusing on personalized medicine and prioritizing precise dosing, variable formats, and other patient-specific needs.

80.    Telehealth providers' focus on personalized medicine has met prescriber and patient demand, as well as the persistent need for individualized care for both drugs and services.

81.    Compounding pharmacies have also increased in scale commensurate with the rise of telehealth providers. The increased scale of telehealth providers permitted them to work directly with reliable compounding pharmacies that could

fulfill doctors' prescriptions for large numbers of patients based on individual need and on a national basis. This trend prompted compounding pharmacies to scale operations beyond the local environments where they had traditionally competed and to obtain pharmacy licenses to operate in all fifty states to service telehealth provider patient needs.

82.    In this context, telehealth providers provide a unique and important channel of demand for national compounding pharmacies, like Strive.

83.    Aggregated demand from telehealth providers required compounding pharmacies to scale operations to meet the number of prescriptions for compounded GLP-1 drugs.

84.    As a result of these twin trends, a distribution channel developed.

85.    First, patients would meet with a licensed prescriber (either at brick-and-mortar facilities or via telehealth providers) where the licensed prescriber would assess the patient's need for a GLP-1 drug.

86.    Then, if the patient's need was confirmed, the licensed prescriber would then write a prescription for either a branded GLP-1 drug or a compounded GLP-1 drug, based on the licensed prescriber's professional medical assessment of that individual patient's need.

87.    The prescription would then be sent to a pharmacy for fulfillment and dispensed to the patient.



88.     In the pharmaceutical industry, prescriptions are crucial. Pharmacies cannot dispense medicine without valid prescriptions for a specific drug. Pharmacies can only dispense compounded medicines if the prescriber specifically prescribes a compounded version of the drug.

89.     As a result, any agreement that requires telehealth providers to refuse to write prescriptions for compounded drugs results in exclusion of compounding pharmacies from the market.

## VI.    ELI LILLY AND NOVO NORDISK ACT ANTICOMPETITIVELY TO FORECLOSE COMPOUNDERS FROM COMPETING FOR GLP-1s

90.     From 2022 through March 2025, Eli Lilly and Novo Nordisk's branded GLP-1 drugs were added to the FDA's drug shortage list, based on the FDA's finding that brand manufacturers could not produce enough product for pharmacies to fulfill all U.S. prescriptions for GLP-1 drugs.

91.    When the FDA determines that there is a drug shortage, compounding pharmacies are sometimes called upon to bridge the gap by creating "copies" of brand manufacturers' drugs.

92.    During the GLP-1 drug shortage, compounding pharmacies stepped in and helped shore up supply, filling GLP-1 prescriptions for patients for several years, both with exact copies of branded GLP-1 drugs and with individualized versions of GLP-1 drugs that doctors prescribed.

93.    During this time, prescriber demand for personalized compounded versions of GLP-1 drugs also continued to grow.

94.    Importantly, compounding pharmacies' ability to create copies of *branded* GLP-1 drugs did not affect prescriber demand for *personalized*, compounded versions of GLP-1 drugs.

95.    The "copies" were no better at meeting specific patient needs than branded GLP-1 drugs; they were identical.

96.    By early 2025, many U.S. patients taking GLP-1 drugs—especially those paying out-of-pocket—had come to rely on compounded GLP-1 drugs prescribed by their physicians and fulfilled by compounding pharmacies.

97.    Novo Nordisk estimated that roughly a third of the U.S. for-cash market was being serviced by compounding pharmacies.

98.    In March 2025, the FDA removed Eli Lilly and Novo Nordisk's GLP-1 drugs from its shortage list, limiting compounding pharmacies' ability to produce exact copies of those drugs and causing the amount of such copies to decrease.

99.    However, the need for tailored or "personalized" compounded GLP-1 drugs remained high and physicians continued to prescribe GLP-1 drugs, personalized for patients, to meet patient needs.

100.    As of today, it is estimated that in the for-cash market for GLP-1 drugs, Eli Lilly has a 55% market share, Novo Nordisk has a 35% market share, and compounding pharmacies make up the remaining 10%.

101.    Because compounded GLP-1 drugs are better than branded GLP-1 drugs at serving many patients with personalized needs (as determined by their prescribing physicians), both Eli Lilly and Novo Nordisk realized that access to compounded medications, particularly via national compounding pharmacies, was taking away potential business from their branded GLP-1 drugs.

102.    On May 7, 2025, the former Chief Executive Officer of Novo Nordisk, Lars Jorgensen, noted this trend, stating: "You have seen in the US that our [prescriptions] have been a bit lower than we expected and that is really because compounders took part of our business away. . . . The volume of compounded GLP-1 in the US is estimated to have impacted the uptake of Wegovy prescriptions and the growth of branded obesity market during the first quarter of 2025."

103.    Likewise, Eli Lilly has alleged that Strive is pursuing a business model that "diverts" patients away from Eli Lilly branded GLP-1 medications.

## A.    BOTH ELI LILLY AND NOVO NORDISK SET UP ONLINE PHARMACIES

104.    To more effectively compete with compounding pharmacies, both Eli Lilly and Novo Nordisk set up online pharmacies as direct-to-consumer cash channels.

105.    Eli Lilly launched its online pharmacy, LillyDirect™, on January 4, 2024.

106.    LillyDirect™ operates effectively like a telehealth provider, in that it provides access to "independent"[2] doctors and direct home delivery of select Eli Lilly medicines through third-party pharmacy dispensing services.

107.    Novo Nordisk launched its direct-to-patient online pharmacy, NovoCare Pharmacy, on March 5, 2025.

108.    NovoCare Pharmacy was specifically designed to assist cash-paying customers in fulfilling their GLP-1 prescriptions.

109.    In an explicit attempt to compete with compounding pharmacies, both Eli Lilly and Novo Nordisk heavily discounted the price of the GLP-1 drugs that could be purchased through their online pharmacies.

110.    Novo Nordisk discounted Wegovy from a list price of $1,349 per month to $499 per month. Eli Lilly also heavily discounted the price of Zepbound.

---

[2] Although Eli Lilly markets that LillyDirect™ connects patients with "independent telehealth services," the Texas Attorney General sued Eli Lilly alleging that Eli Lilly is using LillyDirect™ to operate an illegal kickback scheme and as "yet another tool . . . to funnel patients to certain of [Eli Lilly's] covered drugs." *Texas ex rel. Health Choice Alliance, LLC v. Eli Lilly & Co.*, No. 25-0720 (71st District Court of Harrison County, Texas).

111.    However, despite the end of the shortage and the launch of competing direct-to-consumer pharmacies, neither Eli Lilly nor Novo Nordisk was content to compete with compounding pharmacies on the merits. Instead, both firms made systematic efforts to effectively exclude compounding pharmacies from the for-cash market for GLP-1 drugs altogether.

## B.    BOTH ELI LILLY AND NOVO NORDISK ENGAGED IN EXCLUSIVE DEALING WITH MAJOR TELEHEALTH PROVIDERS

112.    Prescriptions are the lifeblood of compounding pharmacies. Without prescriptions for compounded pharmaceuticals written for individual patients, compounding pharmacies would lack business to sustain their operations. Eli Lilly and Novo Nordisk have taken steps to limit the number of prescriptions for compounded GLP-1 drugs and exclude competition from compounding pharmacies by entering into exclusive agreements with major telehealth providers that bar medical practitioners associated with those telehealth providers from writing prescriptions for compounded medicines.

113.    In late 2024 and through early 2025, Eli Lilly entered partnership agreements with Teladoc, Ro, and LifeMD among others.

114.    Novo Nordisk followed suit in April 2025 by entering into partnership agreements with Hims & Hers, Ro, LifeMD, Weight Watchers Clinic, Noom, and GoodRx among others.

115.    In entering partnership agreements with telehealth providers, Eli Lilly and Novo Nordisk have required that those telehealth providers agree not to work with compounding pharmacies to fulfill prescriptions for compounded GLP-1 drugs,

even when a patient's prescribing physician writes a prescription for a compounded version of a GLP-1 drug.

116.    In effect, these agreements limit both prescriber choice and patient access to the medications that would most benefit the individual patient (as determined by the patient's doctor) and as such harm competition and the competitive process.

117.    Eli Lilly has explicitly confirmed that exclusivity is a requirement of its partnership agreements at the Goldman Sachs 46th Annual Healthcare Conference, stating: "You've seen that we announced several agreements with compounders or telehealth services that were compounding product as well, including Ro that we signed last December. And how we construct our agreements is that we are enforcing in those agreements that as long as the product is out of the shortage list, that those telehealth services are not compounding either tirzepatide or semaglutide, right?"

118.    Novo Nordisk's telehealth partnership agreements contain similar exclusivity commitments.

119.    In June 2025, Novo Nordisk terminated its agreement with the Hims & Hers telehealth provider because Hims & Hers was continuing to work with compounding pharmacies.

120.    Andrew Dudum, CEO of Hims & Hers, commented on the terminated partnership between Hims & Hers and Novo Nordisk, saying Novo Nordisk had pressured Hims & Hers to "steer patients to Wegovy *regardless of whether it was clinically best for patients.*"

121.    Through this conduct, Eli Lilly and Novo Nordisk have foreclosed competition from compounding pharmacies by anticompetitively limiting prescriptions flowing from medical practitioners associated with telehealth providers.



122.    Telehealth providers feel compelled to enter these exclusivity arrangements with Eli Lilly and Novo Nordisk because the threat of losing access to Eli Lilly and Novo Nordisk's GLP-1 drugs is significant to telehealth providers in the United States. For example, when Eli Lilly announced that it would not partner with telehealth providers that worked with compounding pharmacies on GLP-1 drugs, the telehealth provider Hims & Hers' stock fell nearly 4%.

123.    Just days later, Novo Nordisk terminated its own agreement with Hims & Hers—which it had entered just a few months prior—based on concerns about

purported "illegal mass compounding and deceptive marketing." That announcement precipitated a 32% plunge in Hims & Hers' stock.

124.    Other telehealth providers have experienced similar setbacks because of these anticompetitive actions.

125.    The prescriptions associated with these telehealth providers constitute approximately 50% of the total prescriptions of GLP-1 drugs for cash. Moreover, the telehealth channel is differentiated from other prescription channels: telehealth providers' national scale incentivizes their partner organizations to operate nationally themselves (and undertake any associated regulatory costs of doing so).

126.    Contracts restricting telehealth providers' ability to work with compounding pharmacies are not typical in the industry.

127.    On information and belief, there has been no previous instance in which telehealth providers have been contractually prohibited from working with a specific type of fulfillment partner.

128.    Because of this conduct, many of the largest telehealth firms in the United States do not work with compounding pharmacies or allow medical practitioners associated with their platforms to write prescriptions for compounded drugs.

129.    Eli Lilly and Novo Nordisk's contracts with telehealth providers thus do not merely restrict the ability of telehealth providers to work with established business partners: they also restrict physicians' ability to treat their patients and patients' ability to access prescribed medicines for identified medical needs.

130.    To further entrench these restrictions, the brand manufacturers have also threatened prescribing physicians directly.

131.    For example, lawyers for Novo Nordisk have sent letters to doctors demanding that they cease "unlawful participation" in distribution of compounded GLP-1 medicines, and insinuating—incorrectly—that compounding of individualized GLP-1 drugs under Section 503A is illegal.

132.    These letters chill physicians' ability to prescribe compounded GLP-1 drugs, even where that physician determines that such a drug best fits the needs of a particular patient.

133.    In these ways, Eli Lilly and Novo Nordisk's contracts with telehealth providers (1) undermine patient choice, (2) unlawfully limit demand for compounded medication, and (3) suppress competition with both Eli Lilly and Novo Nordisk.

## C.    ELI LILLY HAS ANTICOMPETITIVELY DISPARAGED COMPOUNDED GLP-1 DRUGS

134.    Branded drug manufacturers are legally allowed to market their drugs to prescribers and the public more generally as safe and effective for their intended use after receiving FDA approval.

135.    Eli Lilly can market Mounjaro as a safe and effective treatment for type 2 diabetes. It can also market Zepbound as safe and effective to treat obesity and sleep apnea.

136.    Even though they are legally authorized to be produced and dispensed under Section 503A of the FDCA, compounding pharmacies' drugs are by their nature

not FDA approved. As such, compounding pharmacies are limited from marketing their products as having FDA approval or as safe and effective for their intended use.

137.    Because of these limitations, false and misleading statements about compounding pharmacies' medicines cannot be readily neutralized or offset by counter marketing.

138.    Additionally, public understanding of compounding, even in the medical community, is limited.

139.    For well over a year, Eli Lilly has repeatedly made false statements about compounded drugs with the express purpose of discouraging prescribers and patients from working with compounders.

140.    For instance, in an open letter dated June 20, 2024, Eli Lilly described compounded medications as "never safe to use."

141.    Eli Lilly has also misrepresented the integrity of drug compounding, despite the practice serving an essential and prominent role in the history of American medicine for over a century.

142.    Eli Lilly has dedicated an entire section of its company website to panning compounded drugs, addressing them in connection with "counterfeit" and "fake" medications and characterizing them as "risky" and "unproven."

143.    In September 2024, Eli Lilly Chief Executive Officer David Ricks told reporters in an interview: "We're going after this with our legal tools, we send letters to people and threaten them. We can challenge the physicians who are . . . prescribing [compounded drugs]."

144.    On information and belief, Eli Lilly made these statements as part of its effort to inhibit compounding pharmacies from fulfilling prescriptions for individualized versions of GLP-1 drugs and to discourage physicians and interim partners like telehealth providers from writing or facilitating the writing of prescriptions for individualized versions of GLP-1 drugs.

145.    These false and misleading characterizations of compounding, and specifically of compounded GLP-1 drugs, erode prescriber and patient trust in compounding pharmacies, like Strive, with the intention of limiting compounding prescriptions and undermining meaningful competition for high demand and high value products.

### D.    ELI LILLY HAS ANTICOMPETITIVELY INTERFERED IN THIRD PARTY RELATIONSHIPS

146.    Eli Lilly has engaged in a pattern of using misinformation and fearmongering to interfere with Strive's relationships with medical practitioners, technology platforms, and payment processors to limit competition from compounding pharmacies.

147.    As early as September 2024, Eli Lilly sent letters directly to *patients* they had identified as using compounded GLP-1 drugs, asking for patients to waive their privacy rights and disclose their medical providers' names and contact information.

148.    This tactic was obviously meant to create fear among both patients and prescribers around prescribing or taking compounded GLP-1 medicines.

149.    Eli Lilly later expanded on this practice, focusing on interfering with compounding pharmacies' relationships with payment processors and social media platforms through private quasi-regulatory agencies with whom they had significant business relationships.

150.    Payment systems and social media platforms can incur legal liability for accepting payment or hosting content for illegal businesses, such as counterfeit or fraudulent "pharmaceutical" companies.

151.    Because compounding pharmacies operate in a cash market, they need to accept cash payments from patients in return for fulfilling a prescription, including through payment systems providers.

152.    Patients also rely on social media platforms, such as Meta Platforms, to understand other patients' experiences and the benefits and drawbacks of using compounded medications.

153.    In 2009, Eli Lilly founded the Alliance for Safe Online Pharmacies (ASOP). A May 2010 email introduction from Jeannie Salo, a member of Eli Lilly's government affairs office, stated that "ASOP is the manner in which Lilly (and PhRMA as an observer) is working with other key stakeholders to compile data and collaborate to address the problem of online drug sellers/counterfeits, as we cannot do this as one company, or as PhRMA alone."[3]

---

[3] Pharmaceutical Research and Manufacturers of America (PhRMA) is an industry association that represents and advocates for the pharmaceutical industry. Both Eli Lilly and Novo Nordisk, Inc. are members of PhRMA.

154.    ASOP was co-founded by LegitScript, a private for-profit entity founded only slightly before ASOP in 2007.

155.    LegitScript is engaged in the verification and certification of online pharmacies for payment processors and social media platforms.

156.    The National Association of Boards of Pharmacy (NABP) is a non-profit private entity.

157.    The NABP has an accreditation program offering voluntary, three-year accreditations for pharmacies and distributors, with specific programs for drug distribution, specialty pharmacy, and digital pharmacies.

158.    NABP verifies compliance with professional standards, ensures patient safety by preventing counterfeit drugs, and demonstrates a commitment to quality patient care through a process that includes application, an on-site survey, and annual reviews. Some states require NABP accreditation for a license, and it can expedite the licensing process elsewhere.

159.    Both LegitScript and NABP are highly intertwined with ASOP and Eli Lilly.

160.    LegitScript, NABP, and ASOP are all current defendants in an ongoing antitrust litigation alleging a conspiracy to exclude a rival accreditation group that accredited international pharmacies because it was contrary to the interest of ASOP

members, including Eli Lilly, in maintaining high prices for their drugs in the United States.[4]

161.    Both LegitScript and NABP maintain arbitrary rules that make it more difficult for online compounding pharmacies to maintain accreditation than the online pharmacies of their branded competitors. For instance, both NABP and LegitScript will not grant accreditation where "a merchant or its Affiliate (as that term is defined in the program standards) is subject to an FDA Form 483 Notification regarding compounding."

162.    By contrast, if a branded pharmaceutical manufacturer is subject to an FDA Form 483 notification it is irrelevant to accreditation. For instance, a Novo Nordisk-owned manufacturing plant has known manufacturing issues including an ongoing 483 investigation for cat hair, pests, bacteria, and equipment failures. However, in no way does this impact Novo Nordisk's online pharmacy accreditation because of its status as a branded pharmaceutical manufacturer.

163.    Similarly, one of Eli Lilly's manufacturing facilities is subject to an FDA Form 483 notification documenting problems in tracking manufacturing processes and quality controls to equipment calibration lapses and poor facility maintenance. However, in no way does this impact Eli Lilly's online pharmacy accreditation because of its status as a branded pharmaceutical manufacturer.

---

[4] *See, e.g., PharmacyChecker.com LLC v. National Association of Boards of Pharmacy et al.*, No. 7:19-cv-07577 (S.D.N.Y. 2023).

164. Eli Lilly is aware that challenging compounded pharmacies' accreditation through LegitScript and NABP's private regulatory scheme is an effective means of excluding competition from compounding rivals.

165. Eli Lilly has, in fact, worked to insert itself into compounding pharmacies' relationships with third-party platforms. To accomplish this goal, Eli Lilly has launched a systematic campaign labeling the compounding industry generally as "counterfeit, fake and unsafe" in an effort to have online compounding pharmacies' certifications revoked.

166. Eli Lilly's campaign to interfere in compounding pharmacies' third-party relationships has borne some fruit. On May 17, 2025, Meta pulled down user-led social media groups discussing compounded GLP-1 drugs.

167. Dozens of community groups were shut down overnight under the auspices of selling and marketing illegal or suspended drugs.

168. The same day, payment processors Tebra and Stripe began sending letters to prescribers stating that if they intended to continue to prescribe compounded medicines (even traditionally compounded medicines), there could be a pause in payment processing.

169. On information and belief, Eli Lilly engaged in this conduct as part of its effort to inhibit compounding pharmacies from fulfilling prescriptions for individualized versions of GLP-1 drugs and to discourage physicians and interim partners like telehealth providers from writing or facilitating the writing of prescriptions for individualized versions of GLP-1 drugs.

170.    Eli Lilly's interference in compounding pharmacies' relationships with third parties has had the effect of limiting demand for compounded GLP-1 drugs by reducing discussions about compounded GLP-1s on social media and by threatening to eliminate compounders' ability to receive payment for their services.

## VII.   RELEVANT MARKETS

### A.   THE UNITED STATES IS A RELEVANT ANTITRUST GEOGRAPHIC MARKET

171.    The United States is a relevant geographic market for GLP-1 drugs. Market participants, including manufacturers, prescribers, and patients, recognize this.

172.    Both Eli Lilly and Novo Nordisk reports sales of GLP-1 drugs in the United States as a separate category of sales.

173.    503A compounding pharmacies provide compounded GLP-1 drugs primarily, if not exclusively, to patients in the United States.

174.    Additionally, Eli Lilly, Novo Nordisk, and compounding pharmacies provide GLP-1 drugs in response to prescriptions written by medical practitioners for patients residing in the U.S.

175.    Although Eli Lilly, Novo Nordisk, and compounding pharmacies may provide GLP-1 drugs to non-U.S. markets, United States law and regulation greatly limit the ability of U.S. prescribers and U.S. patients to access medicines, including GLP-1 medicines, from outside the United States.

176.    Americans faced with a small but significant non-transitory increase in the price of GLP-1 treatments could not and would not shift to drug treatments outside the United States to make the heightened price of GLP-1 drugs unprofitable.

177.    In fact, the price of branded GLP-1 drugs inside the United States are as much as 10 times higher than the price of GLP-1 drugs outside the United States.

## B.    GLP-1 DRUGS FOR THE TREATMENT OF OBESITY AND CHRONIC WEIGHT MANAGEMENT IS A RELEVANT ANTITRUST PRODUCT MARKET

178.    GLP-1 drugs for the treatment of obesity and chronic weight management is a relevant antitrust product market ("GLP-1 Weight Loss Market"). GLP-1 drugs for the treatment of obesity and chronic weight management include Zepbound and Wegovy, as well as compounded versions of those drugs.

179.    Other GLP-1 Drugs in the market are either owned by Eli Lilly (Mounjaro) or Novo Nordisk (Ozempic) and are used to treat obesity and chronic weight management off-label or have market shares of less than 1% of the U.S. GLP-1 Weight Loss Market.

180.    Other products are not reasonable substitutes for GLP-1 drugs for the treatment of obesity and chronic weight management.

181.    GLP-1 drugs are distinct from other drugs used to treat obesity because they have dual mechanisms of action: metabolic control and appetite regulation.

182.    Other drugs that are prescribed for the treatment of obesity and chronic weight management generally work by stimulating one or the other.

183.    This unique formulation of GLP-1 drugs leads them to have superior efficacy and comparably better side effect profiles. For example, with respect to

34

obesity treatment, GLP-1 drugs typically lead to a 15% to 25% reduction in weight after about one year of use.

184. Additionally, other drugs for the treatment of diabetes, obesity, and chronic weight management are not generally viewed as alternatives to GLP-1 drugs by prescribing physicians.

185. Price differences between GLP-1 drugs and other weight loss drugs suggest that prescribers and patients do not view other weight loss drugs as product substitutes.

186. Eli Lilly and Novo Nordisk have maintained a duopoly in GLP-1 drugs in the U.S. since at least 2023.

187. As confirmed by Eli Lilly's own reports, as of the second quarter of 2025, Eli Lilly had a market share of 57.9% of the U.S. GLP-1 drug market, while Novo Nordisk controlled 41.7% of the market.

188. Their market shares in prior quarters were similar. Consistent with these numbers, Novo Nordisk estimated its own market share of the GLP-1 class of products at 50% in the United States.

189. Eli Lilly has maintained a monopoly in the GLP-1 Weight Loss Market since at least January 2025. Eli Lilly's market share is currently near 60% and growing and has consistently exceeded 50% in prior quarters.

190. Novo Nordisk has significant market power in the GLP-1 Weight Loss Market since at least 2023. During this time, it has maintained a market share of

about 40% and charged prices both higher than compounded GLP-1 medicines and
other weight loss alternatives.

191.    Eli Lilly and Novo Nordisk have each exploited their individual market
power by forcing telehealth providers—a significant source of prescriptions for
compounded GLP-1 drugs—to either stop working with compounding pharmacies or
risk their ability to obtain branded GLP-1 drugs at all.

192.    Even the perceived inability to obtain branded GLP-1 drugs was
devastating to telehealth providers' business—one had its share price drop more than
30% in a single day at the prospect of losing access.

193.    Faced with this risk, providers had no choice but to cut off partnerships
with compounding pharmacies, regardless of the form of GLP-1 drug prescribed to
patients using those providers.

194.    Eli Lilly and Novo Nordisk's individual market power are each durable.
The FDA approval process for competing branded drugs takes several years and can
cost the applicant several billions of dollars to complete.

195.    Even when a potential competitor has looked likely to undergo the FDA
process and seek FDA approval, Eli Lilly and Novo Nordisk have sought to quash
that competition. For example, Novo Nordisk sought to buy out a potential entrant in
the GLP-1 market, Metsera, for $9 billion several years before it was even possible
that Metsera would be able to offer a competing GLP-1 product.

196.    Compounding pharmacies compete in the GLP-1 Weight Loss Market
when a medical practitioner prescribes a personalized version of the medication.

197.    However, Eli Lilly and Novo Nordisk have sought to foreclose competition from compounding pharmacies through exclusive agreements with telehealth providers, product disparagement, and tortious interference with compounding pharmacies' relationships with technology platforms and payment processors.

### C.    GLP-1 DRUGS FOR THE TREATMENT OF OBESITY AND CHRONIC WEIGHT MANAGEMENT FOR CASH IS A SEPARATE RELEVANT ANTITRUST PRODUCT MARKET

198.    GLP-1 drugs for the treatment of obesity and chronic weight management for cash ("GLP-1 Weight Loss Cash Market") is a separate relevant antitrust product market in the United States.

199.    U.S. insurance companies do not cover all prescribed uses of GLP-1 drugs. Private insurance, Medicare, and Medicaid generally cover GLP-1 drugs when prescribed as a treatment for type 2 diabetes.

200.    When prescribed for weight loss, however, private insurance, Medicare, and Medicaid generally either heavily restrict the criteria for coverage or do not cover GLP-1 drugs at all.

201.    Where insurance coverage for GLP-1 drugs is limited, it is often subject to prior authorization and limits on body mass index. As such, patients paying out of pocket for GLP-1 drugs prescribed for weight loss cannot easily substitute to an insured product to defeat a price increase in the list rate of the GLP-1 medication.

202.    Both Eli Lilly and Novo Nordisk recognize that patients paying out of pocket for GLP-1 drugs prescribed for weight loss cannot easily switch to insured

GLP-1 medications and thus charge different rates between the cash and insured GLP-1 channels.

203.   Compounding pharmacies generally do not have contracts with pharmacy benefit managers and, as a result, are often not covered by insurance plans. As such, compounded GLP-1 drugs are generally only available through the cash channel.

204.   Patients without insurance coverage for GLP-1 drugs cannot substitute to insured GLP-1 medications. This means that there is no cross-elasticity of demand for these patients between the cash and insured channels for GLP-1 drugs.

205.   The lack of cross-elasticity of demand between cash and insured GLP-1 channels is evident in the lower prescription fulfillment rate among cash patients compared to insurance-covered patients. In other words, when the price of GLP-1 medication is too high for a patient paying out of pocket, that patient is more likely to forgo the prescribed medication rather than switch to an insured product.

206.   Eli Lilly and Novo Nordisk's market power in the GLP-1 Weight Loss Cash Market is protected by barriers to entry.

207.   The FDA approval process for competing branded drugs takes several years and can cost the applicant several billions of dollars to complete.

208.   Even when a potential competitor looks likely to undergo the FDA process and seek FDA approval, Eli Lilly and Novo Nordisk have sought to quash that competition. For example, Novo Nordisk has sought to buy out a potential

entrant in the GLP-1 market, Metsera, for $9 billion several years before it was even possible that Metsera would be able to offer a competing GLP-1 product.

209.    Compounding pharmacies compete in the GLP-1 Weight Loss Cash Market when a medical practitioner prescribes a personalized version of the medication.

210.    However, Eli Lilly and Novo Nordisk have sought to foreclose competition from compounding pharmacies through exclusive agreements with telehealth providers, product disparagement, and tortious interference with compounding pharmacies' relationships with technology platforms and payment processors.

211.    Eli Lilly has a monopoly in the market for GLP-1 Weight Loss Cash Market.

212.    Currently, Eli Lilly has a greater than 55 percent share of the GLP-1 Weight Loss Cash Market. Its share of this market has been growing over the last several years and is protected by substantial barriers to entry.

213.    Novo Nordisk has market power in the GLP-1 Weight Loss Cash Market. Currently, Novo Nordisk has a greater than 35% share of the GLP-1 Weight Loss Cash Market.

214.    Although its share of this market has been slightly declining relative to Eli Lilly's share of the market over the last several years, Novo Nordisk has taken market share from compounding pharmacies in part due to the anticompetitive conduct alleged in this complaint.

## VIII.  **ANTICOMPETITIVE EFFECTS**

215.    Eli Lilly obtained or maintained an unlawful monopoly in the GLP-1 Weight Loss and GLP-1 Weight Loss Cash markets in the United States through its exclusive agreements with telehealth providers and other conduct that has separately and collectively harmed competition by:

    a.  Substantially foreclosing competition for GLP-1 medications in the GLP-1 Weight Loss and GLP-1 Weight Loss Cash markets.

    b.  Excluding compounding pharmacies from effective distribution channels, denying compounding pharmacies the prescriptions necessary to further scale operations and compete in the GLP-1 Weight Loss and GLP-1 Weight Loss Cash markets.

    c.  Increasing barriers to entry and excluding compounding pharmacy rivals by increasing cost of capital for efforts to scale operations and further compete.

    d.  Increasing prices for patients in the GLP-1 Weight Loss and GLP-1 Weight Loss Cash markets.

    e.  Marginalizing the ability of compounding pharmacies to serve patients with prescriptions for compounded GLP-1 drugs, which removes any meaningful alternative for those patients other than to seek the one-size-fits-most branded GLP-1 drugs that Eli Lilly and Novo Nordisk offer.

f.  Removing the competitive pressure compounding pharmacies bring to bear, which enables Eli Lilly to continue charging supracompetitive prices for branded GLP-1 drugs.

g.  Reducing prescriber and patient choice and access to products that are otherwise easily and safely personalized to meet individual patients' unique circumstances.

h.  Compounded GLP-1 drugs serve patient needs where branded GLP-1 drugs are not the prescriber-*recommended* therapy. Telehealth providers served a significant number of patients with prescriptions for compounded GLP-1 drugs, until Eli Lilly and Novo Nordisk effectively forced them to stop partnering with compounding pharmacies. This action invades the doctor-patient relationship, inhibiting the ability to help patients obtain medicines that best meet their needs. It also frustrates patients' ability to actually obtain those medicines. And it creates challenges to accessing effective alternatives to branded GLP-1 drugs, despite the broad availability of those alternatives.

i.  Limiting prescriber and patient demand for compounded GLP-1 medications by making false accusations about the nature and safety of compounded drugs, compounding pharmacies are strictly limited in their ability to counter misrepresentations. Compounded GLP-1 drugs are not "counterfeit." They are merely versions of GLP-1 drugs

that are adjusted for specific patient needs, as determined by a

licensed prescriber.

216.   Absent Eli Lilly's exclusionary agreements and other conduct, dynamic competition in the GLP-1 Weight Loss and GLP-1 Weight Loss Cash markets would provide patients with higher quality treatments and greater access to needed medication at more attractive terms, with better quality and service.

217.   The anticompetitive effects flowing from Eli Lilly's distribution agreements and other exclusionary conduct, particularly when considered collectively, have allowed Eli Lilly to develop and maintain monopolies in the GLP-1 Weight Loss and GLP-1 Weight Loss Cash markets.

218.   These anticompetitive effects outweigh any benefits from those agreements, or those benefits could be accomplished by less restrictive means.

219.   Novo Nordisk has significant market power in GLP-1 Weight Loss and U.S. GLP-1 Weight Loss Cash markets in the United States.

220.   Novo Nordisk has entered exclusive agreements with telehealth providers that have harmed competition by:

    a.   Substantially foreclosing competition for GLP-1 medications in both the GLP-1 Weight Loss and U.S. GLP-1 Weight Loss Cash markets.

    b.   Excluding compounding pharmacies from effective distribution channels, denying compounding pharmacies the prescriptions necessary to further scale operations and compete in both the GLP-1 Weight Loss and U.S. GLP-1 Weight Loss Cash markets.

c. Increasing barriers to entry and excluding compounding pharmacy rivals by increasing the cost of capital for efforts to scale operations and further compete in both the GLP-1 Weight Loss and U.S. GLP-1 Weight Loss Cash markets.

d. Increasing prices for patients in the GLP-1 Weight Loss and U.S. GLP-1 Weight Loss Cash markets.

e. Marginalizing the ability of compounding pharmacies to serve patients with prescriptions for compounded GLP-1 drugs.

f. Removing any meaningful alternative for those patients other than to seek the one-size-fits-all branded GLP-1 drugs that Novo Nordisk offers. By removing the competitive pressure compounding pharmacies bring to bear, Novo Nordisk continues to charge supracompetitive prices for branded GLP-1 drugs.

g. Reducing choice and access for prescribers and patients when it comes to products that are otherwise easily and safely personalized for individual patients' circumstances. Compounded GLP-1 drugs serve patient needs where branded GLP-1 drugs are not the prescriber-recommended therapy. Telehealth providers served a significant number of patients with prescriptions for compounded GLP-1 drugs, right up until Eli Lilly and Novo Nordisk effectively forced them to stop partnering with compounding pharmacies. This action invades the doctor-patient relationship, inhibiting the ability

to assist patients with obtaining the medicines that best meet their needs. It also frustrates patients' ability to actually obtain those medicines. And it creates challenges to accessing effective alternatives to branded GLP-1 drugs, despite the broad availability of those alternatives.

221.    The anticompetitive effects flowing from Novo Nordisk's anticompetitive agreements have allowed Novo Nordisk to maintain substantial market power and supracompetitive prices by limiting access to compounded medications.

222.    The anticompetitive effects of these agreements outweigh any benefits from those agreements.

## IX.    CAUSES OF ACTION

### Count I
### Monopolization of the U.S. GLP-1 Market in Violation of Sherman Act Section 2
### (Eli Lilly)

223.    Plaintiff incorporates the allegations of paragraphs 1 through 222 above.

224.    The GLP-1 Weight Loss and U.S. GLP-1 Weight Loss Cash markets in the United States are relevant antitrust markets and Eli Lilly has monopoly power in both markets.

225.    Eli Lilly has unlawfully monopolized the GLP-1 Weight Loss and U.S. GLP-1 Weight Loss Cash markets in the United States through exclusionary conduct, including:

    a.   Entering exclusive agreements on telehealth providers;

44

b.  Disparaging compounded GLP-1 drugs in false and/or misleading ways; and

c.  Interfering in Strive's relationships with patients, prescribers, third-party technology platforms, and payment processors.

226.  Eli Lilly's exclusionary conduct, in isolation and the aggregate effect of the combined conduct, have harmed competition, the competitive process, and consumers by foreclosing a substantial portion of the GLP-1 Weight Loss and U.S. GLP-1 Weight Loss Cash markets in the United States.

227.  Eli Lilly's exclusionary conduct lacks procompetitive justifications sufficient to offset the competitive harm it causes.

### Count II
### Restraint of Trade in Violation of
### Sherman Act Section 1
### (Eli Lilly)

228.  Plaintiff incorporates the allegations of paragraphs 1 through 227 above.

229.  The GLP-1 Weight Loss and U.S. GLP-1 Weight Loss Cash markets in the United States are relevant antitrust markets and Eli Lilly has market power in both these markets.

230.  Eli Lilly has unlawfully restrained trade in the GLP-1 Weight Loss and U.S. GLP-1 Weight Loss Cash markets in the United States by entering into exclusive agreements with telehealth providers, whereby the telehealth providers are barred from working with compounding pharmacies, thereby cutting off telehealth patients' access to compounded versions of GLP-1 drugs that their physicians prescribed.

231.    Eli Lilly's unlawful agreements with telehealth providers have harmed competition, the competitive process, and consumers.

232.    Eli Lilly's unlawful agreements with telehealth providers have foreclosed a substantial portion of the GLP-1 Weight Loss and U.S. GLP-1 Weight Loss Cash markets.

233.    Eli Lilly's unlawful agreements with telehealth providers lack procompetitive justifications sufficient to offset the competitive harm they cause.

### Count III
### Restraint of Trade in Violation of
### Sherman Act Section 1
### (Novo Nordisk)

234.    Plaintiff incorporates the allegations of paragraphs 1 through 222 above.

235.    The GLP-1 Weight Loss and U.S. GLP-1 Weight Loss Cash markets in the United States are relevant antitrust markets and Novo Nordisk has market power in those market.

236.    Novo Nordisk has unlawfully restrained trade in the GLP-1 Weight Loss and U.S. GLP-1 Weight Loss Cash markets in the United States by entering into exclusive agreements with telehealth providers that explicitly bar the telehealth providers from partnering with compounding pharmacies, thereby cutting off telehealth patients' access to compounded versions of GLP-1 drugs that their physicians prescribed.

237.    Novo Nordisk's unlawful agreements with telehealth providers have harmed competition, the competitive process, and consumers.

238.    Novo Nordisk's unlawful agreements with telehealth providers have foreclosed a substantial portion of the GLP-1 Weight Loss and U.S. GLP-1 Weight Loss Cash markets.

239.    Novo Nordisk's unlawful agreements with telehealth providers lack procompetitive justifications sufficient to offset the competitive harm they cause.

## X.    REQUEST FOR RELIEF

240.    To remedy these illegal acts, Plaintiff requests that the Court:

    a.    Adjudge and decree that Eli Lilly has acted unlawfully to monopolize the GLP-1 Weight Loss and U.S. GLP-1 Weight Loss Cash markets in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

    b.    Adjudge and decree that Eli Lilly has entered unlawful exclusive agreements with telehealth providers in violation of the Sherman Act, 15 U.S.C. § 1;

    c.    Adjudge and decree that Novo Nordisk has entered unlawful exclusive agreements with telehealth providers in violation of the Sherman Act, 15 U.S.C. § 1;

    d.    Award Plaintiff treble damages, as well as an amount equal to its costs, reasonable attorneys' fees, and prejudgment interest under 15 U.S.C. § 15a;

    e.    Enjoin Eli Lilly and Novo Nordisk from continuing to engage in the anticompetitive practices described herein and from engaging in any

other practices with the same purpose and effect as the challenged practices;

f.   Enter any other preliminary or permanent relief necessary and appropriate to restore competitive conditions in the markets affected by Eli Lilly and Novo Nordisk's unlawful conduct; and

g.   Enter any additional relief the Court finds just and proper.

## XI.    JURY DEMAND

241.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues properly triable in this case.

Date: January 14, 2026                 Respectfully submitted,

By: */s/ Joshua J. Bennett*        

**BAKER & HOSTETLER LLP**
Courtney Barksdale Perez
Texas Bar No. 24061135
Joshua J. Bennett
Texas Bar No. 24059444
2850 North Harwood Street
Suite 1100
Dallas, TX 75201-2640
Tel.: (214) 210-1200
cbperez@bakerlaw.com
jjbennett@bakerlaw.com

Timothy S. Longman
(pro hac vice forthcoming)
Matt Schock
(pro hac vice forthcoming)
1050 Connecticut Avenue NW
Suite 1100
Washington, DC 20036
Tel.: (202) 861-1500
tlongman@bakerlaw.com
mschock@bakerlaw.com

- and -

David M. Prichard
Texas Bar No. 16317900
dprichard@pomllp.com
David R. Montpas
Texas Bar No. 00794324
dmontpas@pomllp.com
**Prichard Oliver Montpas, LLP**
10101 Reunion Place, Suite 600
San Antonio, Texas 78216
Tel.: (210) 477-7400

*Attorneys for Plaintiff Strive Specialties Inc.*

49