**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| STRIVE SPECIALTIES INC., <br><br> *Plaintiff,* <br><br> v. <br><br> ELI LILLY & CO., <br> NOVO NORDISK A/S, and <br> NOVO NORDISK INC. <br><br> *Defendants.* | Case No.  5:26-cv-00155-MA |

**PLAINTIFF STRIVE SPECIALTIES INC.'S OPPOSITION**
**TO NOVO NORDISK DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFF'S FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

BACKGROUND .................................................................................................................... 2

LEGAL STANDARD............................................................................................................. 2

ARGUMENT .......................................................................................................................... 2

    I.     STRIVE HAS PLAUSIBLY ALLEGED THE EXISTENCE OF
           ANTICOMPETITIVE AGREEMENTS ..................................................... 2

    II.    STRIVE PLAUSIBLY ALLEGES A RELEVANT ANTITRUST
           MARKET AND MARKET POWER ........................................................... 4

           A.     Strive Plausibly Alleges Market Definition................................ 5

           B.     Strive Plausibly Alleges Market Power ...................................... 7

    III.   STRIVE PLAUSIBLY ALLEGES ANTICOMPETITIVE
           CONDUCT BY NOVO, RESULTING IN ANTICOMPETITIVE
           EFFECTS.......................................................................................... 9

           A.     Novo's Agreements are Anticompetitive Under Section 1 of
                the Sherman Act ......................................................................... 10

           B.     Novo's Agreements are Anticompetitive Under Section 3 of
                the Clayton Act ........................................................................... 12

            C.     Novo Has Not Shown That Its Anticompetitive Conduct is
                Implausible ................................................................................. 13

    IV.   STRIVE HAS STANDING ................................................................. 14

    V.    NOVO DISTORTS STRIVE'S ALLEGATIONS AND LEGAL
           STANDARDS ON ANTICOMPETITIVE EFFECTS........................... 18

CONCLUSION...................................................................................................................... 19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.,*
  2022 WL 980791 (W.D. Tex. Mar. 31, 2022) ........................................................ 9

*Acad. of Allergy & Asthma in Primary Care v. Superior Healthplan, Inc.,*
  2020 WL 10051766 (W.D. Tex. May 4, 2020) ..................................................... 5

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.,*
  300 F.3d 620 (5th Cir. 2002) ............................................................................... 5

*Assoc. Radio Serv. Co. v. Page Airways, Inc.,*
  624 F.2d 1342 (5th Cir. 1980) ............................................................................. 9

*Atl. Richfield Co. v. USA Petroleum Co.,*
  495 U.S. 328 (1990) ............................................................................................ 15

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ............................................................................................. 2

*BNI Franchising, LLC v. Network for Action Int'l, LLC,*
  2026 WL 818331 (S.D. Tex. March 24, 2026) .................................................... 19

*Brown Shoe Co. v. United States,*
  370 U.S. 294 (1962) ............................................................................................. 6

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977) ........................................................................................... 14

*In re Cardizem CD Antitrust Litig.,*
  332 F.3d 896 (6th Cir. 2003) ............................................................................. 17

*Corr v. AT&T, Inc.,*
  893 F. Supp. 2d 789 (N.D. Miss. 2012) .............................................................. 4

*Dr.'s Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.,*
  123 F.3d 301 (5th Cir. 1997) ............................................................................. 17

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,*
  732 F.2d 480 (5th Cir. 1984) ............................................................................... 8

*E. I. du Pont de Nemours & Co., v. Kolon Indus., Inc.,*
  637 F.3d 435 (4th Cir. 2011) ............................................................................. 19

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
504 U.S. 451 (1992) .................................................................................... 8, 13

*Epic Games, Inc. v. Apple, Inc.,*
67 F.4th 946 (9th Cir. 2023)........................................................................ 8, 9

*Eytalis v. Nat'l Ass'n of Realtors,*
2025 WL 2054094 (N.D. Tex. June 9, 2025)...................................................... 16

*Fortner Enters., Inc. v. U.S. Steel Corp.,*
394 U.S. 495 (1969) ......................................................................................... 13

*FTC v. Motion Picture Adver. Serv. Co.,*
344 U.S. 392 (1953) ......................................................................................... 13

*FTC v. Whole Foods Mkt., Inc.,*
548 F.3d 1028 (D.C. Cir. 2008).......................................................................... 6

*FTC v. Wilh. Wilhelmsen Holding ASA,*
341 F. Supp. 3d 27 (D.D.C. 2018) ...................................................................... 6

*Games People Play, Inc. v. Nike, Inc.,*
2015 WL 13657672 (E.D. Tex. Feb. 13, 2015) ...................................................... 15

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.,*
386 F.3d 485 (2d Cir. 2004)........................................................................ 10, 18

*Hornsby Oil Co. v. Champion SparkPlug Co.,*
714 F.2d 1384 (5th Cir. 1983) ...............................................................*passim*

*Innovative Health LLC v. Biosense Webster*, Inc.,
2020 WL 5921964 (C.D. Cal. Aug. 18, 2020) ........................................................ 4

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde,*
466 U.S. 2 (1984) .............................................................................................. 8

*In re Katrina Canal Breaches Litig.,*
495 F.3d 191 (5th Cir. 2007) .............................................................................. 2

*Le v. Zuffa, LLC,*
216 F. Supp. 3d 1154 (D. Nev. 2016) ................................................................ 11

*LePage's Inc. v. 3M,*
324 F.3d 141 (3d Cir. 2003).............................................................................. 12

*Location Servs., LLC v. Digit. Recognition Network,*
2018 WL 5787317 (N.D. Tex. Nov. 5, 2018) ........................................................ 17

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ........................................................................ 10

*Norris v. Hearst Tr.*,
    500 F.3d 454 (5th Cir. 2007) ....................................................................... 16

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) ....................................................................................... 5

*Oxbow Carbon & Minerals LLC v. Union Pac. R.R.*,
    81 F. Supp. 3d 1 (D.D.C. 2015) ................................................................... 15

*Pulse Network, L.L.C. v. Visa, Inc.*,
    30 F.4th 480 (5th Cir. 2022) ................................................................. 14, 15

*RealPage, Inc. v. Yardi Sys., Inc.*,
    852 F. Supp. 2d. 1215 (C.D. Cal. 2012) ....................................................... 11

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979) ..................................................................................... 17

*Rio Grande Royalty Co. v. Energy Transfer Partners, LP*,
    786 F. Supp. 2d 1202 (S.D. Tex. 2009) ....................................................... 16

*Robertson v. Sea Pines Real Estate Cos.*,
    679 F.3d 278 (4th Cir. 2012) ....................................................................... 15

*Roxul USA, Inc. v. Armstrong World Indus., Inc.*,
    2019 WL 1101385 (D. Del. Mar. 8, 2019) ............................................. 13, 14

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*,
    28 F.3d 1379 (5th Cir. 1994) ......................................................................... 7

*Standard Oil Co. of Cal. v. United States*,
    337 U.S. 293 (1949) ............................................................................... 12, 13

*Star Tobacco Inc. v. Darilek*,
    298 F. Supp. 2d 436 (E.D. Tex. 2003) ........................................................... 3

*Tampa Elec. Co. v. Nash. Coal Co.*,
    365 U.S. 320 (1961) ........................................................................ 12, 14, 18

*Tex. v. Blackrock, Inc.*,
    2025 WL 2201071 (E.D. Tex. Aug. 1, 2025) ............................................... 11

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) ........................................................................ 14

*United States v. Realty Multi-List, Inc.*,
    629 F.2d 1351 (5th Cir. 1980) ......................................................................... 7, 8

*United States v. Visa USA, Inc.*,
    344 F.3d 229 (2d Cir. 2003) ......................................................................... 11, 18

*Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc.*,
    2015 WL 6994438 (W.D. Tex. Oct. 15, 2015) ...................................... 11, 12, 13, 18

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) ............................................................................. 10

## Statutes

15 U.S.C. § 1 ..................................................................................................... 14

15 U.S.C. § 14 ................................................................................................ 3, 14

## Other Authorities

P. Areeda, et al., Antitrust Law: An Analysis of Antitrust Principles
    and Their Application (2025 ed.) § 348a .................................................... 15

## INTRODUCTION

Strive Specialties Inc.'s ("Strive") claims against Novo Nordisk A/S and Novo Nordisk Inc. (together "Novo") in this case are straightforward: Novo, at its own insistence, struck agreements with telehealth providers to stop those providers from working with Strive and other compounding pharmacies, which compete with Novo. As a result, Strive is cut off from a significant customer base and that customer base is substantially foreclosed from obtaining physician-prescribed substitutes—individualized, compounded products—to Novo's branded GLP-1 drugs.

Novo does not deny the existence of the alleged agreements, its ability to insist on them, its conduct to enforce them, or their exclusive effect. Instead, it argues that: (1) its arrangements with telehealth providers, while exclusive, are not exclusive **enough** to violate the antitrust laws; (2) it does not control enough of the market to have or wield market power; and (3) it either does not compete with Strive at all or it competes with Strive on far more than the First Amended Complaint ("FAC") alleges.

These assertions mischaracterize Strive's allegations and the law. Agreements do not need to foreclose **all** competition in order to violate the antitrust laws; even one competitor in the market at issue is enough, and that is without even considering the effects of additional restrictive conduct that reinforces foreclosure—conduct which Strive clearly alleges and which could support foreclosure claims even in the absence of an express contract. Nor does market share automatically determine Novo's ability to act anticompetitively. Those are factual inquiries, the predicates to which—*e.g.*, supracompetitive prices, restricted output of compounded GLP-1 drugs, reduced consumer choice—Strive has plausibly pled. And competition between Novo and Strive cannot be seriously questioned where Novo itself has admitted in public statements that compounding pharmacies take away potential business from Novo.

Novo's Motion to Dismiss ("Motion") should be denied.

## BACKGROUND

Strive initiated this action on January 14, 2026. *See* Doc. 1. On April 3, 2026, Strive amended its complaint. *See* Doc. 41. On April 26, 2026, Novo filed its Motion. *See* Doc. 42. This opposition brief follows.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)), *cert. denied*, 552 U.S. 1182 (2008) (internal quotations omitted). This does not require detailed factual allegations, but it does require "more than labels and conclusions" or "a formulaic recitation  of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Courts first disregard conclusory allegations as not entitled to the assumption of truth, but view well-pled facts as true and in the light most favorable to the plaintiff. *See id.* at 555-57. Courts then determine whether the remaining well-pled allegations give rise to plausible entitlement to relief. *See id.*

## ARGUMENT

Strive plausibly pleads both of its claims against Novo. Novo admits to its agreements with telehealth providers and does not contest that those agreements restrict telehealth providers from working with compounding pharmacies, including Strive. Instead, Novo argues that Strive's views of the market and the agreements' effects are inaccurate. These assertions distort Strive's allegations and are inappropriate to consider on a motion to dismiss. Novo's motion should be denied.

I.    **STRIVE HAS PLAUSIBLY ALLEGED THE EXISTENCE OF ANTICOMPETITIVE AGREEMENTS.**

A complaint based on an illegal agreement must allege "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. Strive alleges—and Novo does not deny—that Novo

2

entered agreements with major telehealth platforms, including Ro, Teladoc, Weight Watchers Clinic, Noom, GoodRx, and Hims & Hers. Doc. 41, ¶ 102. Nor does Novo contest the adequacy of Strive's allegations that these agreements "bar medical practitioners associated with those telehealth providers from writing prescriptions for compounded medicines." Doc. 41, ¶ 113.

Instead, Novo asserts that Strive's pleading fails because "Strive does not allege that Novo Nordisk's agreements required [telehealth platforms] to **only** purchase GLP-1 products from Novo Nordisk." Doc. 42, at 9 (emphasis added). In essence, Novo suggests that an agreement does not violate Section 3 of the Clayton Act or Section 1 of the Sherman Act if it fails to foreclose **every** competitor from working through a particular distribution channel. But that is not the law. Section 3 of the Clayton Act states:

> It shall be unlawful for any person . . . to lease or make a sale or contract for sale of a good . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not deal in the good of **a competitor** of the lessor or seller where the effect . . . may be to substantially lessen competition or tend to create a monopoly.

15 U.S.C. § 14 (emphasis added). This "differentiation between 'a competitor' and 'competitors'" sinks Novo's argument: "[i]nclusion of the singular 'a competitor' clearly indicates that a sales agreement conditioned on the buyer's agreement to refuse to purchase from even a single competitor of the seller may be prohibited by Clayton Act § 3 and [the Texas Free Enterprise and Antitrust Act][1] § 15.05(c)." *Star Tobacco Inc. v. Darilek*, 298 F. Supp. 2d 436, 443 (E.D. Tex. 2003).

*Darilek* comports with well-established Fifth Circuit law. "Borrowing from Clayton Act jurisprudence, . . . a proscribed exclusionary agreement is established if the buyer is not free to deal in competitive goods," even if the restriction applies to only one competitor. *Hornsby Oil Co. v. Champion SparkPlug Co.*, 714 F.2d 1384,

---

[1] The TFEAA is Texas's state law analog to Section 1 of the Sherman Act.

1397 (5th Cir. 1983). Thus, both Section 3 of the Clayton Act and Section 1 of the Sherman Act prohibit agreements that effectively forbid buyers from purchasing from a supplier's competitor.

Novo cites no case to the contrary. Its authorities merely state that a complaint alleging violations of Section 3 of the Clayton Act and Section 1 of the Sherman Act, based on unlawful agreements, must "plausibly allege any such agreements are actually in existence." *Corr Wireless Commc'ns, LLC v. AT&T, Inc.*, 893 F. Supp. 2d. 789, 809 (N.D. Miss. 2012); *Innovative Health LLC v. Biosense Webster, Inc.*, 2020 WL 5921964, at *6-7 (C.D. Cal. Aug. 18, 2020) (dismissing claims for failure to allege "any exclusive terms" and stating that "hospitals [did] not contractually agree to [use the relevant product] purchased from [the defendant]").

Strive has met this pleading requirement. It alleges that Novo has entered into partnership agreements with several large telehealth platforms, Doc. 41 ¶ 115, and that those agreements are conditioned on not working with Strive and other competing compounding pharmacies, *id.* ¶¶ 112-133. These allegations are in no way speculative: they are based on public statements of persons involved in negotiating the contracts that Novo insisted upon such terms. *Id.* ¶ 121. Strive has also alleged that Novo took additional action to bolster its anticompetitive agreements, including physician intimidation. *Id.* ¶¶ 134-36. Novo does not challenge these allegations, either.

## II.    STRIVE PLAUSIBLY ALLEGES A RELEVANT ANTITRUST MARKET AND MARKET POWER.

The FAC alleges cognizable relevant markets—only one of which Novo challenges[2]—and Novo's market power in those markets. Novo's assertions to the

---

[2] Novo does not challenge and therefore concedes the legal sufficiency of Strive's allegations as to the geographic market (the United States) and the GLP-1 Weight Loss Market (the product market for GLP-1 drugs for the treatment of obesity and chronic weight management). Doc. 41 ¶¶ 175-201.

contrary ignore straightforward allegations and raise premature questions of fact.

### A.    Strive Plausibly Alleges Market Definition.

"[T]he relevant market is defined as the area of effective competition"—*i.e.*, "the arena within which significant substitution in consumption or production occurs"—and "must correspond to the commercial realities of the industry." *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) ("*Amex*") (cleaned up). "Whether a relevant market has been identified is usually a question of fact." *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002). "[A] motion to dismiss a complaint for failure adequately to [sic] plead a relevant antitrust market should be granted only where the alleged market can be deemed patently implausible solely on the basis of the four corners of the complaint." *Acad. of Allergy & Asthma in Primary Care v. Superior Healthplan, Inc.*, 2020 WL 10051766, at *15 (W.D. Tex. May 4, 2020) (cleaned up).

Strive's relevant market definition clears this hurdle easily. Strive alleges that "GLP-1 drugs for the treatment of obesity and chronic weight management for cash" is a relevant antitrust market. Doc. 41 ¶¶ 202-23. Insurance generally does not cover compounded GLP-1 drugs or any GLP-1 drugs prescribed for weight loss, and patients whose insurance does not cover GLP-1 drugs cannot obtain those drugs through insurance. *Id.* ¶¶ 204-08. Thus, patients who pay cash for GLP-1 drugs prescribed for weight loss generally cannot choose instead to pay through insurance—*i.e.*, they cannot substitute. *Id.* To the extent "reference to the rule of reasonable interchangeability and cross-elasticity of demand" is required for market definition, as Novo suggests, Doc. 42, at 13, Strive explicitly states as much, Doc. 41 ¶¶ 205-09.

Novo insists that insurance and cash payment channels cannot be separated because the GLP-1 drugs sold through those channels are interchangeable. Doc. 42, at 13. But that ignores "commercial realities" that relevant markets must reflect. *Amex*, 585 U.S. at 544. While, in a vacuum, some GLP-1 drugs may be

interchangeable, in reality, patients cannot use insurance to pay for un-covered drugs, even if the "insured" version and the "cash" version of that drug are identical. *See FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 45 (D.D.C. 2018) (for market definition, "the touchstone is demand substitution," which "focuses on customers' ***ability*** and willingness to substitute away from one product to another[.]") (cleaned up, emphasis added). These substitution limitations reveal a market with "'distinct customers,' paying 'distinct prices,' [which] may constitute a recognizable submarket" for antitrust purposes. *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1039 (D.C. Cir. 2008) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

Moreover, as Strive has alleged, insurers strictly limit coverage for GLP-1 drugs for weight loss, which means that even for ***insured*** patients seeking GLP-1 drugs for weight loss, the insurance channel is not a reasonable substitute for the cash channel. Doc. 41 ¶ 204; *see also Whole Foods*, 548 F.3d at 1039 ("market definition focuses on what products are ***reasonably*** substitutable") (emphasis in original). Notably, Novo does not contest this point for GLP-1 drugs prescribed for weight loss, but for GLP-1 drugs generally. Doc. 42, at 13. Although some patients may "purchase GLP-1s with some form of insurance" when prescribed for another reason—*e.g.*, type-2 diabetes, Doc. 41, ¶ 48—those purchases are not within the scope of Strive's claims here.

Novo itself has recognized the existence of a distinct for-cash market in the ordinary course, even going so far as to estimate shares within that market. Doc. 41 ¶ 98. This "industry or public recognition of the submarket as a separate economic entity" is yet another of the "practical indicia" of market boundaries that supports the plausibility of Strive's market definition. *Brown Shoe*, 370 U.S. at 325. It is also entirely consistent with the FAC's allegations of competition: compounded GLP-1 medications are viewed as "alternatives" to Novo's branded GLP-1 drugs, so much so

6

that Novo opened a direct-to-consumer, cash-pay pharmacy to "more effectively compete" with the likes of Strive. Doc. 41 ¶¶ 53, 72, 105-112. Novo "realized that access to compounded medications, particularly via national compounding pharmacies, was taking away potential business from their branded GLP-1 drugs," prompting its CEO to state explicitly that "compounders took part of our business away." *Id.* ¶¶ 102-03. Strive also alleges Novo discounted product in the cash-pay channel in direct response to this competition in "an explicit attempt to compete." *Id.* ¶ 110. These allegations plausibly assert cross-elasticity of demand.

Importantly, Strive did not allege, as Novo argues, that patients who are prescribed compounded GLP-1 drugs "medically cannot use branded GLP-1 treatments," whatever that phrase may mean. Doc. 42, at 15.[3] The FAC alleges prescribers use their judgment to recommend the drug option that "is in the best medical interest of the patient," and that prescribers determine when compounded drugs "are better than branded GLP-1 drugs at serving many patients." Doc. 41 ¶ 70, 102. These allegations are consistent with competition in the relevant market.

### B.    Strive Plausibly Alleges Market Power.

"Market power is the ability to control prices or exclude competition." *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1386 (5th Cir. 1994). Courts "do not set strict mathematical standards regarding the level of market power which must be shown; in any given case, the question whether the [defendant] has the requisite power may turn on a number of different factors relevant to the structure of the market." *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1373 (5th Cir. 1980). In practice, market power corresponds to "sufficient economic importance that exclusion results in the denial of the opportunity to compete effectively on equal

---

[3] Novo mischaracterizes the FAC as alleging that Strive "mass compounds," Doc. 42, at 15, but those are Novo's words. Whatever Novo might mean by them, the FAC clearly alleges that Strive compounds as authorized by law. Doc. 41 ¶ 4.

terms." *Id.*; *see also Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 982 (9th Cir. 2023) (market power is "the 'special ability to force a contracting partner to do something that he would not do in a competitive market.'") (quoting *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13-14 (1984)) (cleaned up).

Strive alleges that it has been denied the opportunity to compete because of Novo's ability to force telehealth providers to stop working with Strive and other compounding pharmacies. *See* Doc. 41 ¶ 229. This ability permits Novo to charge prices for branded GLP-1 drugs that are supracompetitive—*i.e.*, higher than they would be if Novo faced, rather than excluded, competition that compounding pharmacies bring to bear. *Id.* ¶¶ 229-30. Novo's ability is also durable and protected by barriers to entry, including the costly FDA-approval process for competing drugs and Novo's propensity for attempting to acquire even nascent competitors in the market for GLP-1 drugs. *Id.* ¶¶ 210-12. These assertions make clear that Novo has the ability to exclude competition and raise prices by forcing telehealth providers "to do something [they] would not do in a competitive market," *Epic Games*, 67 F.4th at 982, and are more than sufficient to plausibly allege market power.

Novo claims it lacks sufficient market share to have market power. But while market share is sometimes used as a ***proxy*** for market power, it is not required to ***allege*** market power. *Realty Multi-List*, 629 F.2d at 1373. Nor is "50%" a legally cognizable threshold for market power, as Novo suggests. Although the Fifth Circuit has suggested that "a defendant must have a market share of at least fifty percent before he can be guilty of ***monopolization***," *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 489 (5th Cir. 1984) (emphasis added), Strive makes no monopolization claim against Novo here. And as the Supreme Court has held, "[m]onopoly power under § 2 requires, of course, something ***greater*** than market power under § 1," so a 50% market share threshold for market power is nonsensical. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992) (emphasis

8

added). Indeed, while Novo states that "[t]his Circuit has suggested that at least 50% share is required to find market power," Doc. 42 at 19, the case it cites holds the opposite: "A court ***cannot*** infer market power from a bare assertion of market share." *Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*, 2022 WL 980791, at *8 (W.D. Tex. Mar. 31, 2022) (emphasis added).

Nor is it always necessary to plead market power by alleging the independent ability to raise prices, "because Sherman Act cases may involve markets in which a defendant has substantial market power or monopoly power (and has *already* exercised that power to charge a supracompetitive price)." *Epic Games*, 67 F.4th at 975 n.7; *see also id.* (by focusing too heavily on certain indicia of market power, "a court may risk a false negative: *over*-defining a market and finding no market power where, in fact, it does exist."). Strive alleges that Novo consistently raised its GLP-1 drug prices until faced with competition, and even then, did not decrease them, suggesting the ability to maintain already-supracompetitive prices. Doc. 41 ¶¶ 39-40.

## III. STRIVE PLAUSIBLY ALLEGES ANTICOMPETITIVE CONDUCT BY NOVO, RESULTING IN ANTICOMPETITIVE EFFECTS.

Strive alleges that Novo has used its market power to harm competition in the for-cash U.S. GLP-1 weight loss cash market by cutting off compounding pharmacies' access to GLP-1 cash patients, Doc. 41 ¶¶ 113-37, punishing cash patient providers (Hims & Hers) to reinforce foreclosure, *id.* ¶¶ 120-27, and threatening providers to further freeze out compounding pharmacies, *id.* ¶¶ 135-36. Novo's Motion largely ignores and thus concedes the anticompetitive effects of its punishment and threats. Its exclusive arrangements are plausibly anticompetitive and, when "[t]aken together," support Strive's Sherman Act Section 1 and Clayton Act Section 3 claims. *Assoc. Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1356 (5th Cir. 1980). Even if evaluated in isolation from Defendants' other conduct, Novo's conduct is sufficiently alleged to render Strive's claims plausible.

9

### A.    Novo's Agreements are Anticompetitive Under Section 1 of the Sherman Act.

"There is no set formula for evaluating the legality of an exclusive dealing agreement." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012). But courts assessing such agreements as competitive restraints generally "focus[] on the competitive significance of [the] restraint, to be measured by reference to the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed, as well as the actual impact of this restraint on competition." *Hornsby Oil*, 714 F.2d at 1392 (cleaned up). The ultimate question is whether the exclusive agreements are unreasonable for "freez[ing] out a significant fraction of buyers or sellers from the market." *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 508 (2d Cir. 2004). Put differently, the core question is whether the agreements are plausibly alleged to result in significant foreclosure.

The FAC alleges multiple ways that Novo's exclusive agreements unreasonably restrain competition, including blocking competitors—*i.e.*, Strive and other compounding pharmacies—from a significant share of prescription providers—*i.e.*, the telehealth channel—needed to compete effectively in the market. Doc. 41 ¶¶ 113-17, 129, 229. This is textbook anticompetitive and textbook foreclosure. *See ZF Meritor*, 696 F.3d at 270 (explaining exclusive agreements adversely affect competition by depriving competitors "of a market for their goods") (citation omitted). Also, by targeting the largest telehealth providers representing the "essential" channel for compounding pharmacies to distribute GLP-1 drugs to cash purchasers, Doc. 41 ¶¶ 6, 113, 132, 214-15, 229, Novo's agreements keep Strive and other compounding pharmacies "below the critical level necessary" to "pose a real threat." *United States v. Microsoft Corp.*, 253 F.3d 34, 71 (D.C. Cir. 2001) (explaining anticompetitive effects of depriving competitors of scale needed to be efficient).

10

Marginalizing compounding pharmacies also reduces alternatives for both prescribers and patients who would be better served by personalized compounded GLP-1 drugs. Doc. 41 ¶¶ 133, 229. This "reduction in consumer choice" further harms competition. *Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc.*, 2015 WL 6994438, at *17 (W.D. Tex. Oct. 15, 2015). Overall, prices for GLP-1 cash drugs would be lower, and output of personalized compounded GLP-1 drugs would be higher, if not for these restraints, Doc. 41 ¶¶ 5, 9-10, 41-44, 132-37, 194, 224, 229-30, resulting in well-established anticompetitive effects. *See Tex. v. Blackrock, Inc.*, 2025 WL 2201071, at *16 (E.D. Tex. Aug. 1, 2025) ("Think increased prices, decreased output, or lower quality goods.") (citation omitted).

These anticompetitive effects are plausible in the U.S. GLP-1 weight loss cash market. *See Hornsby Oil*, 714 F.2d at 1392 (explaining particularities of each market must be considered). It is a duopoly with Novo and Defendant Eli Lilly and Company ("Lilly") sharing an extraordinary 90%+ of the market, with dominant positions protected by strong entry barriers. *See* Doc. 41 ¶¶ 210, 219-20. With both Novo and Lilly deploying similar restrictions, *id.* ¶¶ 113-37, the exclusivity agreements used by each of them can substantially suppress competition. Courts have held that even defendants with less than 35% market shares can plausibly impose substantial foreclosure in highly concentrated or restrained markets like those alleged here. *See United States v. Visa USA, Inc.*, 344 F.3d 229, 239 (2d Cir. 2003) (affirming 26% share of "highly concentrated" market suffices for Sherman Act § 1 claim); *RealPage, Inc. v. Yardi Sys., Inc.,* 852 F. Supp. 2d. 1215, 1229-30 (C.D. Cal. 2012) (denying dismissal motion because even a "flimsy" market share allegation supports substantial foreclosure in duopoly market). Novo's punishing telehealth providers and threatening prescribers that tried to circumvent its exclusivity agreements, Doc. 41 ¶¶ 120-27, 135-36, further bolsters the plausibility of their foreclosure effect. *See, e.g., Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1168 (D. Nev. 2016) (citing defendant's

11

"threats, intimidation, and retaliation" as supplementing ability to substantially foreclose market).

**B.    Novo's Agreements are Anticompetitive Under Section 3 of the Clayton Act.**

Section 3 of the Clayton Act proscribes more conduct than Section 1 of the Sherman Act. *See Tampa Elec. Co. v. Nash. Coal Co.*, 365 U.S. 320, 335 (1961). Under Section 3 of the Clayton Act, Strive need only allege it is *probable* that the challenged exclusive arrangements will foreclose substantial commerce in the U.S. GLP-1 weight loss cash market. *See id.* at 327. In making this determination, courts consider market conditions and competitive impacts holistically, including nature of product, seller power, entry barriers, amount of foreclosure, agreement terms, availability of other distribution channels, and current and future competitive impacts. *Universal Hosp. Servs.*, 2015 WL 6994438, at *15-16.

The FAC plausibly alleges substantial foreclosure based on the cumulative effect of alleged exclusionary conduct. Both Novo and Lilly have deployed exclusivity arrangements, Doc. 41 ¶¶ 101, 113-37, making it probable that Novo's arrangements will foreclose substantial commerce in the U.S. GLP-1 weight loss cash market. *See Standard Oil Co. of Cal. v. United States*, 337 U.S. 293, 314 (1949) (relying on "widespread adoption" of exclusive agreements in determining defendant's 16% share was unlawful § 3 foreclosure). Indeed, these arrangements allegedly block competitors like Strive from major telehealth distribution channels essential to compete effectively, Doc. 41 ¶¶ 6, 113-16, 133, amplifying foreclosure effects. *See LePage's Inc. v. 3M*, 324 F.3d 141, 160 (3d Cir. 2003) (emphasizing defendant's exclusive arrangements blocked "key retail pipelines" needed "to compete profitably"). Additionally, actual adverse effects (*i.e.* reduced competition, inflated patient prices, decreased product availability), Novo's use of punishment and threats to enforce its exclusivity, and Novo's anticompetitive purposes for deploying them,

summarized above, make it plausible that Novo's arrangements will substantially foreclose the cash market in the future. *See Universal Hosp. Servs.*, 2015 WL 6994438, at \*14 (denying motion to dismiss § 3 claim when complaint, as here, alleged qualitative substantial foreclosure).

### C.   Novo Has Not Shown That Its Anticompetitive Conduct is Implausible.

Novo asserts that it is implausible that its actions could result in the anticompetitive effects Strive alleges. But those arguments are overly formalistic and not tied to the practical consequences likely to flow from Novo's conduct.

Novo first focuses on the allegation that its actions foreclosed 35% of the market, arguing it is 5% too little, Doc. 42 at 10-11—the very "formalistic distinction[]" disfavored in antitrust law. *Eastman Kodak*, 504 U.S. at 466. Contrary to Novo's assertion, determining foreclosure involves "a cumulative assessment" and "not just a determination of the percentage of the market foreclosed." *Universal Hosp. Servs.*, 2015 WL 6994438, at \*14 (citation omitted).

The FAC actually alleges that Novo has foreclosed ***at least*** 35% of the market. Doc. 41 ¶ 223. Novo's portrayal of that allegation as a ceiling impermissibly draws inferences against Strive. And even if Novo's share were 35% or less, it would suffice for this duopoly market. *See* § III(A), *supra*. Novo also ignores that, for purposes of assessing market effects, it is appropriate to consider its foreclosure share is combined with Lilly's because, as the Supreme Court explained, the "combination" of arrangements by "established suppliers" can enable each independently to preclude its competitors. *Standard Oil*, 337 U.S. at 309, 314; *see also Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 504 (1969) (combining effects of non-conspiring firms' contracts); *FTC v. Motion Picture Adver. Serv. Co.*, 344 U.S. 392, 395 (1953) (same); *Roxul USA, Inc. v. Armstrong World Indus., Inc.*, 2019 WL 1101385, at \*4 (D. Del.

Mar. 8, 2019) ("the Supreme Court approved aggregation in the context of the antitrust laws" for assessing foreclosure).

Novo further errs by presuming agreements that are not expressly "long-term or not easily terminable" are not actionable, Doc. 42, at 11-12, neglecting that the Sherman and Clayton Acts apply broadly to *all* "contract[s]" and "restrictions," 15 U.S.C. §§ 1, 14; there is no need to even have a written agreement, let alone any precise terms. What matters is the "practical effect" of an agreement or restriction, regardless of form. *Tampa Elec.*, 365 U.S. at 324, 326. The FAC explains that Novo's arrangements with telehealth providers practically foreclose compounding pharmacies' access to GLP-1 cash patients, because the importance of accessing Novo's drugs compels telehealth providers to accept its exclusivity restrictions, Doc. 41 ¶¶ 123, 215-17, and telehealth providers are economically compelled to adhere to those restrictions indefinitely to avoid risk of drastic decrease in business valuation or costly litigation by Novo as a consequence of ending them. *Id.* ¶¶ 123-28, 215-17. And Novo has cemented its arrangements by threatening telehealth providers and physicians against circumventing them. *Id.* ¶¶ 121, 135-36. These allegations sufficiently notify Novo of its exclusivity arrangements that "realistically" are as effective as long-term or difficult-to-terminate written contracts. *United States v. Dentsply Int'l, Inc.,* 399 F.3d 181, 193 (3d Cir. 2005) (even "at-will" exclusivity restrictions effectuated foreclosure because of economic incentive to continue doing business with the defendant).

## IV.   STRIVE HAS STANDING.

To allege standing, Strive need only plead that its injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes [Novo's] acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Antitrust standing simply confirms the "asserted injury reflects 'an anticompetitive aspect of the defendant's conduct.'" *Pulse Network, L.L.C. v. Visa,*

14

*Inc.*, 30 F.4th 480, 488 (5th Cir. 2022) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 (1990)).

It is hornbook antitrust law that "a rival clearly has standing to challenge the conduct of rival(s) that is illegal." P. Areeda, et al., Antitrust Law: An Analysis of Antitrust Principles and Their Application (2025 ed.) § 348a. At this stage, "[t]he pleadings need only create a reasonable inference of an antitrust injury." *Games People Play, Inc. v. Nike, Inc.*, 2015 WL 13657672, at *5 (E.D. Tex. Feb. 13, 2015); *see also Oxbow Carbon & Minerals LLC v. Union Pac. R.R.*, 81 F. Supp. 3d 1, 7 (D.D.C. 2015) (denying dismissal and holding that complaint "need not show more than general factual allegations" of injury); *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 291 (4th Cir. 2012) (complaints need not "make a case" or "forecast evidence" on injury). The FAC plausibly alleges antitrust injury.

Novo argues Strive does not compete with it, asserting there is "zero overlap" between compounded and branded GLP-1s. Doc. 42 at 15. But Novo mischaracterizes the FAC, which plausibly alleges competition. Products need not be identical to compete in the same market; rather, they need only "have reasonable interchangeability for the purposes for which they were produced—price, use and qualities considered." *Hornsby Oil*, 714 F.2d at 1393; *see also* § II(A), *supra.*

Novo also misreads the FAC's allegations about the types of compounded drugs Strive could dispense during the FDA-declared GLP-1 drug shortage. Doc. 42 at 15. The FAC simply points out that Strive's ability to compound copies of branded products during the shortage did not eliminate demand for its compounded personalized drugs. Doc. 41 ¶¶ 95-96. That observation takes nothing away from Strive's allegations that its compounded products continue to compete with Novo's branded products.

The cases Novo cites for purported lack of competition are irrelevant here. One involved distributors of plaintiff's newspaper product who were not consumers,

15

producers, or sellers of competing publications. *Norris v. Hearst Tr.*, 500 F.3d 454, 466 (5th Cir. 2007). The other involved a plaintiff who "concede[d] it d[id] not participate in the relevant market," but claimed it suffered injury in another market where prices were calculated by reference to the relevant market's prices. *Rio Grande Royalty Co. v. Energy Transfer Partners, LP*, 786 F. Supp. 2d 1202, 1214-15 (S.D. Tex. 2009). The facts of those cases are fundamentally inconsistent with the FAC's allegations.

Novo next argues semantics, suggesting that Strive does not allege harm to itself because the FAC in three places uses the phrase "like Strive," as in, for example, the allegation that Novo's false and misleading characterizations of compounding "threaten and erode prescriber and patient trust in compounding pharmacies, like Strive, with the intention of limiting compounding prescriptions and undermining meaningful competition for high demand and high value products." Doc. 41 ¶ 149; *see also id.* ¶ 5 (referring to competition between Novo and compounding pharmacies "like Strive"); ¶ 83 (referring to THPs as an important channel for "national compounding pharmacies, like Strive."). It is clear, or at very least a reasonable inference, that these references are meant to refer to Strive ***as well as*** the category of similar compounding pharmacies that includes Strive. Novo's footnote assertion that Strive failed to allege injury in-fact for Article III standing is based on this same semantic argument and likewise should be rejected. The only case Novo cites in support of its argument that Strive failed to plead harm to itself is an unpublished decision where the issue was the exact opposite of the proposition for which Novo cites it: a pro se plaintiff had "not properly pleaded antitrust injury because she failed to plead injury to competition, as opposed to only injury to herself." *Eytalis v. Nat'l Ass'n of Realtors*, 2025 WL 2054094, *4 (N.D. Tex. June 9, 2025). The FAC does not suffer from this deficiency.

16

Lastly, Novo asserts the FAC lacks plausible allegations of harm to competition, but again it misreads the FAC. The FAC alleges harm to competition in the form of supracompetitive pricing and reduced customer options, among other effects. *See, e.g.*, Doc. 41 ¶¶ 43, 111, 235 (supracompetitive pricing); *id.* ¶¶ 116-17, 224-30 (reducing consumer choice). These are well-recognized antitrust injuries. *See, e.g., Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979) (inflated prices); *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 910 (6th Cir. 2003) (reduced consumer options).

Novo insinuates that allegations of consumer harm would have supported standing, Doc. 42 at 17, but ignores that Strive made those exact allegations. The FAC details how telehealth providers are restricted by Novo's anticompetitive conduct from prescribing compounded GLP-1 drugs for patients, even if those are the drugs their treating physicians prescribe. *See, e.g.*, Doc. 41 ¶¶ 113-136. The FAC also alleges consumers pay supracompetitive prices because of Novo's anticompetitive conduct and that Novo used threats and enforcement of agreements with telehealth providers not to prescribe compounded GLP-1 drugs, resulting in the exclusion of Strive and other compounding pharmacies from an important channel. *See, e.g., id.* ¶¶ 43, 111, 116, 235. This form of restrictive and exclusive conduct is itself an injury the Fifth Circuit has recognized as sufficient for antitrust standing. *Dr.'s Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305-06 (5th Cir. 1997) (holding that the rival hospital's "alleged losses and competitive disadvantage because of its exclusion from [preferred provider organization] fall easily within the conceptual bounds of antitrust injury, whatever the ultimate merits of its case."). The FAC's extensive allegations are at odds with the case Novo cites on this point, in which the plaintiff did "not plead any facts" to connect alleged harms to anticompetitive conduct. *Location Servs., LLC v. Digit. Recognition Network*, 2018 WL 5787317, at *2 (N.D. Tex. Nov. 5, 2018).

17

## V.    NOVO DISTORTS STRIVE'S ALLEGATIONS AND LEGAL STANDARDS ON ANTICOMPETITIVE EFFECTS.

Novo argues that the FAC alleges no anticompetitive effects under the rule of reason. Doc. 42, at 18-19. But that misreads the FAC, which alleges that Novo's conduct has adversely affected GLP-1 cash product prices, output, and availability. *See* § III *supra*. This is "direct evidence" of anticompetitive effects—*i.e.*, "an actual adverse effect on competition"—which means "there is no need" for Strive "to show market power in addition," *Geneva Pharms.*, 386 F.3d at 509, though it does so anyway.

Even if the direct effects Strive has alleged were not dispositive, Novo wrongly presumes that it cannot, as a matter of law, act anticompetitively unless it has "at least 50% share." Doc. 42, at 19-20. Novo rebuts its own argument by acknowledging elsewhere that 40% or less can be anticompetitive. *Id.* at 10. In any event, Novo's argument fails because Section 3 of the Clayton Act reaches exclusivity arrangements in their "incipiency," when anticompetitive effects are merely "probable." *Tampa Elec.*, 365 U.S. at 325-27. Exclusivity arrangements, thus, can be plausibly "anticompetitive" under § 3 when used by firms with shares far less than 50%. *See, e.g., Universal Hosp. Servs.*, 2015 WL 6994438, at *15 (share of 12-15% sufficient to state § 3 claim). For Section 1 of the Sherman Act, Novo's singular focus on market share further errs by ignoring that market circumstances under the rule of reason are considered holistically, *see Hornsby Oil*, 714 F.2d at 1392, and the totality of Novo's alleged conduct, in a duopoly market, subject to the additional pervasive restraints by Lilly, can be anticompetitive despite Novo's less than 50% share. *See, e.g., Visa USA*, 344 F.3d at 239.

Novo also erroneously asserts there are no other "qualitative factors" supporting 35% as share sufficient to support "substantial foreclosure." Doc. 42, at 11. In fact Novo overlooks many plausible qualitative allegations that go directly to

18

that point, including the durable, protected duopoly market structure, Novo and Lilly together restraining at least 50% of that market, the anticompetitive conduct by both Defendants in addition to their shared use of exclusivity, and Novo and Lilly each charging inflated prices for reduced choice and output with respect to GLP-1 drugs for cash. Doc. 41 ¶¶ 113-74, 210-30.[4] Novo's repeatedly cited *BNI Franchising* is inapt since it is not a Clayton Act Section 3 case or a Sherman Act Section 1 case, and, unlike here, it involved alleged *lack* of foreclosure. *BNI Franchising, LLC v. Network for Action Int'l, LLC*, 2026 WL 818331 (S.D. Tex. Mar. 24, 2026), at \*10, \*20 (alleging 40% of agreements at issue were exited every year).

The totality of Strive's allegations plausibly state that Novo's exclusivity arrangements will substantially foreclose the relevant market, and that Novo's exclusivity agreements are unreasonable for substantially foreclosing the market. Novo's quibbles are no grounds for pre-discovery dismissal. *See E. I. du Pont de Nemours & Co., v. Kolon Indus., Inc.*, 637 F.3d 435, 452 n.12 (4th Cir. 2011) (reversing dismissal and explaining complaints need not allege foreclosure specifics prior to discovery).

## CONCLUSION

For the foregoing reasons, Novo's Motion should be denied in full.

---

[4] None of the remaining distortion of FAC allegations and illogical theories asserted by Novo make Strive's claims implausible. Novo invents an allegation of "declining market share." Doc. 42, at 20 (citing Doc. 41 ¶¶ 39, 108-09, 111). The purported "50%" of "alternative methods of distribution," *id.* at 12, apparently presumes Novo's and Lilly's own online pharmacies are "alternatives." Novo's purported "efforts to compete on price," *id.*, are immaterial and contrary to allegations that prices remain inflated and output and choice are reduced. Doc. 41 ¶¶ 5, 9-10, 41-44, 132-37, 194, 224, 229-30. Novo's recalculation of its market share to less than 35%, Doc. 42, at 11, while not clear, misconstrues Strive's allegations and draws impermissible factual inferences against Strive.

19

Respectfully submitted,

By: */s/ Joshua J. Bennett*

**BAKER & HOSTETLER LLP**
Joshua J. Bennett
Texas Bar No. 24059444
2850 North Harwood Street
Suite 1100
Dallas, TX 75201-2640
Tel.: (214) 210-1200
jjbennett@bakerlaw.com

Timothy S. Longman
(*pro hac vice*)
Matt Schock
(*pro hac vice*)
1050 Connecticut Avenue NW
Suite 1100
Washington, DC 20036
Tel.: (202) 861-1530
tlongman@bakerlaw.com
mschock@bakerlaw.com

David M. Prichard
Texas Bar No. 16317900
dprichard@pomllp.com
David R. Montpas
Texas Bar No. 00794324
dmontpas@pomllp.com
**Prichard Oliver Montpas, LLP**
10101 Reunion Place, Suite 600
San Antonio, Texas 78216
Tel.: (210) 477-7400

*Attorneys for Plaintiff Strive Specialties Inc.*

20

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of May, 2026, I electronically filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification and access to a copy of such filing to all counsel of record.

*/s/ Joshua J. Bennett*
Joshua J. Bennett