**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

STRIVE SPECIALTIES INC.,

*Plaintiff,*

v.

ELI LILLY & CO.,
NOVO NORDISK A/S,
and NOVO NORDISK INC.

*Defendants*

Case No. 5:26-CV-0155-MA

**BRIEF FOR TEXAS AND LOUISIANA AS *AMICI CURIAE***

**IN SUPPORT OF NO PARTY**

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... i

INTRODUCTION AND INTEREST OF *AMICI*.......................................................... 1

ARGUMENT ...................................................................................................................... 2

    I.      A Relevant Market Can Be Defined from the Perspective of a Distinct Group of Consumers..................................................................................................................... 2

        A.  The Fifth Circuit Defines Relevant Markets from the Consumer Perspective. ............... 2

        B.  Relevant Markets Can Be Defined from the Perspective of a Distinct Group of Consumers.................................................................................................................... 3

    II.    Plaintiffs Can Allege Substantial Foreclosure Based on Qualitative Factors .................. 6

        A.  Substantial Foreclosure Turns on the "Probable Effect" of Conduct, No Minimum Foreclosure Percentage Required. ......................................................................... 7

        B.  Neither *BRFHH Shreveport* nor *BNI Franchising* Require a Specific Minimum Foreclosure Percentage ........................................................................................... 9

CONCLUSION.................................................................................................................. 10

# TABLE OF AUTHORITIES

**Cases**

*Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209 (D.D.C. 2022).................... 10, 12

*Am. Spirit & Cheer Essentials, Inc. v. Varsity Brands, LLC*, 2022 WL 22895737 at *10 (W.D. Tenn. Mar. 30, 2022) ................................................................................................... 7

*Apani Sw., Inc. v. Coca-Cola Enters.*, 300 F.3d 620 (5th Cir. 2002) ............................................. 5

*Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342 (5th Cir.1980)......................... 8

*BNI Franchising, LLC v. Network for Action INTL., LLC*, 2026 WL 818331, (S.D. Tex. Mar. 24, 2026) .......................................................................................................... 10, 11

*BRFHH Shreveport, LLC v. Willis-Knighton Medical Center*, 49 F.4th 520 (5th Cir. 2022) ...... 10

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ......................................................... 5, 6

*E. I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435 (4th Cir. 2011).......................... 10

*Endure Indus. Inc. v. Vizient Inc.*, 164 F.4th 405 ................................................... 4, 5, 7, 8

*Frame-Wilson v. Amazon.com, Inc.,* 591 F. Supp. 3d 975 (W.D. Wash. 2022) ........................... 7

*FTC v. Hackensack Meridian Health, Inc.*, 2021 WL 414506 at *1 (D.N.J. Aug. 4, 2021) .......... 7

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) ............................................................. 7

*FTC v. U.S. Anesthesia Partners In*c., 2024 U.S. Dist. LEXIS 85714 at *27 (S.D. Tex. May 13, 2024). ..................................................................................................................... 6

*FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028 (D.C. Cir. 2008)........................................... 7

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.,* 383 F. Supp. 3d 187 (S.D.N.Y. 2019) ..................................................................................................... 10

*In re Pool Products Distribution Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367 (E.D. La. 2013)....... 7

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003)..................................................................... 10

*PSKS, Inc. v. Leegin Creative Leather Prods. Inc.*, 615 F.3d 412 (5th Cir. 2010)........................ 5

*Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480 (5th Cir. 2022) ............................................................................................. 8

*Retractable Technologies., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883 (5th Cir. 2016) .......... 8

*Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961).................................................. 9

*Texas v. United States*, 126 F.4th 392 (5th Cir. 2025)............................................................... 8

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291 (9th Cir. 1982) ... 10

*United States v. Live Nation, Entm't Inc.*, 2026 WL 456804 at *15 (S.D.N.Y. Feb. 18, 2026)..... 7

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir 2001).......................................... 11, 12

*Universal Hospital Services v. Hill-Rom Holdings*, Inc, 2015 WL 6994438 at *14 (W.D. Tex. Oct. 15, 2015). ...................................................................................................... 9

*Woods Expl. & Producing Co. v. Aluminum Co. of Am.*, 438 F.2d 1286 (5th Cir. 1971) ..................................................................................................... 8

*X Corp. v. Apple, Inc.*, 4:25-CV-00914-P, (N.D. Tex. Aug. 25, 2025) ........................................ 9

The States of Texas and Louisiana, by and through their Attorneys General, respectfully submits this brief as *amici curiae*.

**INTRODUCTION AND INTEREST OF *AMICI***

Amici States Texas and Louisiana are empowered to protect Texas and Louisiana consumers from antitrust violations and enforce state and federal antitrust laws in this Circuit. As such, Amici States have a strong interest in the correct application of antitrust laws. Amici States submit this brief to address two ways in which Defendants' motions to dismiss could be read to heighten the pleading bar for federal antitrust claims to the detriment of consumers.

*First*, the Fifth Circuit does not define relevant markets from the perspective of sellers but instead defines relevant markets from the perspective of consumers. *See Endure Indus. Inc. v. Vizient Inc.*, 164 F.4th 405, 411 (5th Cir. 2026). Plaintiffs who plausibly allege that a distinct group of consumers has only a narrow range of options state a relevant market, even if a seller could or does sell to other consumers too. Whatever the result of this case, the Court should recognize that courts in this circuit "fundamentally define[] product markets . . . from the demand side," that is, from consumers' perspectives. *Id*.

*Second*, this Court should not require plaintiffs alleging exclusive dealing to allege a specific minimum percentage of market foreclosure. Courts in this Circuit and others regularly deny motions to dismiss even where plaintiffs include *no* allegation of the percentage of market foreclosed, and no Fifth Circuit case speaks to the contrary.

Amici States take no position on Defendants' other arguments or the merits of Plaintiff's claims.

**ARGUMENT**

**I.    A Relevant Market Can Be Defined from the Perspective of a Distinct Group of Consumers.**

**A.  The Fifth Circuit Defines Relevant Markets from the Consumer Perspective.**

The Fifth Circuit consistently directs courts to define relevant markets from the perspective of consumers: A relevant market "must include all commodities reasonably interchangeable by *consumers* for the same purposes." *PSKS, Inc. v. Leegin Creative Leather Prods. Inc.*, 615 F.3d 412, 414 (5th Cir. 2010) (emphasis added) (quoting *United States v. E.I. du Point Nemours & Co.*, 351 U.S. 377, 395 (1956)) (quotation marks omitted). The circuit court's other formulations of how to define a relevant market similarly turn on the consumer's perspective—not the seller's. For example, the extent to which "a seller's product is interchangeable in use" refers to how consumers use products. *Apani Sw., Inc. v. Coca-Cola Enters.*, 300 F.3d 620, 626 (5th Cir. 2002) (quotation omitted). Likewise, the degree of "cross-elasticity of demand between the product itself and substitutes for it" is an economist's phrase for the extent to which consumers switch between products. *Id.*; *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (same); *Endure Indus. Inc. v. Vizient Inc.*, 164 F.4th 405, 411 (5th Cir. 2026) (similar). And, in *Endure Industries Inc. v. Vizient Inc.*, the circuit court explicitly endorsed "orient[ing] market analysis towards consumers' choices." 164 F.4th at 411. Theoretical ideas about how products should function or could be sold don't define relevant markets; actual consumers' actual options do.

This principle applies even when a case is brought by a competing seller. *See Apani,* 300 F.3d at 623 (plaintiff competing seller); *Endure*, 164 F.4th at 409 (same). Contrary to the Defendants' out-of-circuit cases, *see* Dkt. 52 at 6 (citing Dkt. 43 at 13-14) and Dkt. 51 at 4, the Fifth Circuit has never suggested that the principles for defining a relevant market depend on

2

whether the plaintiff is a "seller" or a "buyer." Instead, regardless of the plaintiff's identity, courts in this circuit "fundamentally define[] product markets . . . from the demand side," that is, from consumers' perspectives. *Endure*, 164 F.4th at 411.

### B. Relevant Markets Can Be Defined from the Perspective of a Distinct Group of Consumers.

The Supreme Court and district courts applying this consumer-focused standard sustain market definitions alleged to reflect "distinct customers, distinct prices" even if, in the abstract, other broader or narrower markets may theoretically exist. *Brown Shoe*, 370 U.S. at 325. As the Supreme Court recognized in *Brown Shoe*, within a broader market or industry, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Id.* Thus, the Supreme Court has recognized distinct markets for "men's, women's, and children's shoes." *Id.* at 326.

In line with this principle, in *FTC v. U.S. Anesthesia Partners Inc.*, the Southern District of Texas denied a motion to dismiss where the FTC had alleged a market definition from the perspective of a particular group of consumers—there, hospital patients—based on allegations similar to Plaintiff's here. 2024 U.S. Dist. LEXIS 85714 at *26-27 (S.D. Tex. May 13, 2024). The FTC alleged a relevant market of "hospital-only anesthesia services" because patients "requiring hospital care cannot switch to outpatient anesthesia regardless of price." *Id.* The FTC further alleged that the distinctiveness of these hospital patients is reflected in (a) distinct prices for hospital anesthesia and (b) recognition by the defendant and insurers of hospital patients as a unique group. *Id.*[1] The court concluded that, whether or not in-patient and out-patient anesthesia

---

[1] Here, Plaintiff similarly alleged that cash weight-loss patients cannot easily switch to insurance, that cash patients pay different prices, and that Defendants recognize a separate cash market. *See* Dkt. 41 ¶¶ 204, 205, 206, 208, 209.

could be functionally equivalent, the FTC had alleged that the services are not interchangeable or substitutable "as a practical matter" from the perspective of patients who "require[] treatment in a hospital." 2024 U.S. Dist. LEXIS 85714 at *27. Thus, at the motion to dismiss stage, the court "could not "say the FTC has failed to allege a plausible market definition." *Id*.

Other district courts have come to the same conclusion following the "distinct customers, distinct prices" reasoning in *Brown Shoe* and *FTC v. Whole Foods Market, Inc*., 548 F.3d 1028, 1039 (D.C. Cir. 2008) (concurrence). *See In re Pool Products Distribution Mkt. Antitrust Litig*., 940 F. Supp. 2d 367, 378-81 (E.D. La. 2013) ("wholesale distribution of Pool Products" relevant market); *Am. Spirit & Cheer Essentials, Inc. v. Varsity Brands, LLC*, 2022 WL 22895737, at *10-12 (W.D. Tenn. Mar. 30, 2022) (in competing seller case, recognizing "Cheer Competition," "Recreational Cheer," "Athletic Equipment," and "Cheer Camp" as relevant markets, based on customer bases); *Frame-Wilson v. Amazon.com, Inc.,* 591 F. Supp. 3d 975, 990 (W.D. Wash. 2022) (recognizing "ecommerce" and "physical retail markets"); *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 127 (D.D.C. 2016) ("sale and distribution of consumable office supplies to large B-to-B customers" relevant market); *FTC v. Hackensack Meridian Health, Inc.*, 2021 U.S. Dist. LEXIS 158158, *4 (D.N.J. Aug. 4, 2021) ("cluster of inpatient general acute care services sold and provided to commercial insurers and their members" relevant market).

*Endure* does not change the analysis because it did not address alleging a market based on a distinct group of customers. 164 F.4th at 414-18. There, on summary judgment, the defendant challenged the relevant market in two ways:

- *First*, the relevant market did not include all substitutes from the perspective of the alleged distinct group of customers—hospitals—because that group of customers could and did purchase the product at issue *both* through the alleged relevant channel ("group purchasing organizations") and through a separate direct-sales channel;

- *Second*, the relevant market was inappropriately "limited to one kind of customer"—hospitals—and thus improperly "excludes all other healthcare facilities and non-healthcare customers that purchase the same products."

*Id.* at 414. The Fifth Circuit agreed with the first challenge because discovery had shown that more than 27% of hospitals (the alleged distinct group of customers) bought the product using a channel other than the one alleged to be relevant. *Id.* at 414-16. But the circuit court did not reach and expressly "decline[d] to rule" on the second challenge, or "'core customer theory,'" because the plaintiff's argument had not been raised to the district court. *Id.* at 416 n. 7. So, contrary to Defendants' misleading characterizations, *see* Dkt. 42 at 13 and Dkt. 43 at 13, *Endure* says nothing about whether markets can be defined through a specific purchasing/distribution channel where there is a distinct group of customers that can access a product through only that purchasing/distribution channel.

Market definition is of particular importance to the States, as enforcers of federal and state antitrust laws. The States have challenged anticompetitive conduct and mergers in which relevant markets were defined around targeted customers. *See, e.g.*, *United States v. Live Nation*, 2026 WL 456804, at *12-21 (S.D.N.Y. Feb. 18, 2026) (in action brought by Texas and Louisiana as plaintiffs, with 38 other states, denying motion for summary judgment on targeted customer markets); *State of Texas v. Epic Sys. Corp.*, No. 236-372872-25, Order (236th Dist. Ct., Tarrant Cnty., Tex., filed Mar. 13, 2026) (denying motion to dismiss alleged markets that were defined by distinct consumers); *In re: Google Dig. Adv. Antitrust Litig.*, 627 F. Supp. 3d 346, 365 (S.D.N.Y. 2022) (in enforcement action brought by Texas, Louisiana, and 15 other states, recognizing relevant market of "ad-buying tools used by small advertisers"); *see also* DEP'T OF JUSTICE AND FED. TRADE COMM'N, 2023 MERGER GUIDELINES, at 4.3.D.1 ("Markets for targeted customers need not have precise metes and bounds. In particular, defining a relevant market for targeted

customers sometimes requires a line-drawing exercise on observable characteristics. There can be many places to draw that line and properly define a relevant market.").

Thus, if an antitrust plaintiff—whether an enforcer or private plaintiff—identifies the boundaries of the market by reference to the perspective of a group of consumers and the products to which they are actually able to substitute, then the plaintiff has plausibly alleged a relevant market. Of course, whether such a market can be proven following fact discovery is a different question.

## II. Plaintiffs Can Allege Substantial Foreclosure Based on Qualitative Factors.

Regardless of the exact statute, antitrust claims based only on exclusive dealing involve alleging substantial foreclosure.[2] Substantial foreclosure, in turn, depends on the alleged "probable effect" of the exclusive deal. Contrary to Defendants' suggestions, a plaintiff need not allege that any specific minimum percentage of the market is foreclosed. *Cf.* Dkt. 42 at 10, Dkt. 43 at 16, Dkt. 51 at 5-6, Dkt. 52 at 3-4.

---

[2] On the other hand, if the alleged exclusive dealing is only one part of an unlawful scheme, substantial foreclosure is not required: Even if "instances of improper conduct, standing alone," "probably" would not lead to [monopoly] liability, "taken together" they can be sufficient to support a verdict for the plaintiff. *Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1356 (5th Cir. 1980) (affirming monopolization jury verdict); *see also Woods Expl. & Producing Co. v. Aluminum Co. of Am.*, 438 F.2d 1286, 1308 (5th Cir. 1971) (similar); *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 492-93 (5th Cir. 2022) (evaluating components of "integrated strategy" together).

Eli Lilly's citation of *Retractable Technologies, Inc. v. Becton Dickinson & Co.*, 842 F.3d 883 (5th Cir. 2016), Dkt. 51 at 10, for the idea that conduct has not been held to be cumulatively anticompetitive in the Fifth Circuit since 1980, when *Associated Radio* was decided, is inapt for two reasons. First, the 2016 *Retractable* statement is no longer true: in 2022, *Pulse* rejected considering parts of a scheme separately and instead evaluated "the combined effect of" "two components of a single integrated price structure" to find antitrust injury. *Pulse*, 30 F.4th at 493. Second, if there were somehow a clash between *Retractable Technologies* and *Associated Radio*, *Associated Radio* would control under the rule of orderliness: one panel of the Fifth Circuit may not overturn another panel's decision absent an intervening change of law— and Eli Lilly has pointed to none here. *See Texas v. United States*, 126 F.4th 392, 406-07 (5th Cir. 2025).

**A. Substantial Foreclosure Turns on the "Probable Effect" of Conduct, No Minimum Foreclosure Percentage Required.**

In *Tampa Electric Co. v. Nashville Coal Co.*, the Supreme Court framed the substantial foreclosure inquiry qualitatively, holding that

> it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.

365 U.S. 320, 329 (1961).[3]

Confirming this qualitative framework, district courts in this Circuit do not require that plaintiffs allege defendants have foreclosed a specific minimum percentage of the market. For example, in *Universal Hospital Services v. Hill-Rom Holdings, Inc*, the complaint alleged that the defendants had foreclosed the plaintiff "from at least 12-15%" of one of the relevant markets, violating Clayton Act Section 3. 2015 WL 6994438, at *14-*15 (W.D. Tex. Oct. 15, 2015). The district court denied dismissal. *Id.* at *18.

Likewise, in *X Corp. v. Apple, Inc.*, the district court denied dismissal when the plaintiff alleged that the defendants had foreclosed "up to 55 percent" of one of the alleged relevant markets, violating both Section 1 and Section 2 of the Sherman Act. *See* No. 4:25-CV-00914-P, Dkt. 1 (Compl.) at ¶¶104, 182, 210, 218, 230 (N.D. Tex. Aug. 25, 2025); *id.*, Dkt. 68 (Order) (N.D. Tex. Nov. 13, 2025) (Pittman, J.). If a plaintiff needed to plead at least 40% foreclosure to survive a motion to dismiss, then, the *X* complaint, which alleged no minimum level of foreclosure, would have been dismissed. *See id*. Foreclosure of 40% or more is not a necessary allegation.

---

[3] While the Court held that foreclosure of less than 1% of the market was not substantial, it did not set a minimum percentage requirement. *See generally id*.

Other circuits agree that there is no minimum percentage requirement to allege substantial foreclosure. *See E. I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 452 n.12 (4th Cir. 2011) (reasoning that "[w]hile [the plaintiff] did not allege a specific percentage of market foreclosure in its Counterclaim, it would be problematic to reject its Counterclaim . . . on that basis at the prediscovery, motion-to-dismiss stage, when [the plaintiff] likely has insufficient information to calculate a precise number.") (reversing dismissal); *LePage's Inc. v. 3M*, 324 F.3d 141, 158–59 (3d Cir. 2003) (upholding a verdict despite the fact that plaintiff had not alleged specific percentage of foreclosure); *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1304 (9th Cir. 1982) (foreclosure of 24% of market actionable); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.,* 383 F. Supp. 3d 187, 237 (S.D.N.Y. 2019) ("At the motion to dismiss stage, such specific mathematical pleading is unnecessary."); *see also Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 229 (D.D.C. 2022) ("an alleged foreclosure of 35% is not defective as a matter of law").

These holdings are consistent with the holdings governing the States' enforcement actions, which have recognized that the percentage of the market foreclosed by the exclusive contracts can support substantiality, but is not dispositive. *See, e.g.*, *Fed. Trade Comm'n v. Syngenta Crop Prot. AG*, 711 F. Supp. 3d 545, 571 (M.D.N.C. 2024) (in denying motion to dismiss complaint brought by Texas with the Federal Trade Commission and 11 other states, noting that "substantial foreclosure has been found 'even though the contracts foreclose[d] less than [a] roughly 40% or 50% share.'") (quoting *Microsoft*, 253 F.3d at 70); *United States v. Google LLC*, 747 F. Supp. 3d 1, 157 (D.D.C. 2024) (similar, finding significant foreclosure in action brought by Texas and Louisiana, with the Department of Justice and 9 other states). The bright-line rule urged by Defendants is unsupported by case law, whether in the Fifth Circuit or elsewhere, and could hinder

antitrust enforcement efforts by overemphasizing the percentage of the market foreclosed in an otherwise multifactorial foreclosure analysis.

**B. Neither *BRFHH Shreveport* nor *BNI Franchising* Require a Specific Minimum Foreclosure Percentage.**

Defendants cite *BRFHH Shreveport, LLC v. Willis-Knighton Medical Center*, 49 F.4th 520 (5th Cir. 2022), and *BNI Franchising, LLC v. Network for Action INTL., LLC*, 2026 WL 818331, (S.D. Tex. Mar. 24, 2026), as purported support for their 40% minimum foreclosure. *See* Dkt. 42 at 10, Dkt. 43 at 16, Dkt. 51 at 5-6, Dkt. 52 at 3-4. Neither case provides such support.

*BRFHH Shreveport, LLC v. Willis-Knighton Medical Center* requires no minimum foreclosure percentage. 49 F.4th at 520. There, the Fifth Circuit affirmed the lower court's dismissal because the plaintiff had failed to plausibly allege substantial foreclosure. *Id.* at 530-32. But that was because the plaintiff did not "adequately connect" the alleged upstream foreclosure with the alleged downstream relevant market. *Id.* at 531. That is, the plaintiff did not point to any allegations that the challenged restraint foreclosed any part of the relevant market. *Id.* at 530-32. Contrary to Defendants' suggestions here, then, *see* Dkt. 51 at 5 and Dkt. 52 at 3-4, the circuit court nowhere held that plaintiffs need to plead a percentage of foreclosure, let alone that plaintiffs need to plead a specific percentage of foreclosure or need to include some kind of magic words or language to support a pleaded percentage and make it non-conclusory. Accordingly, *BRFHH* is inapposite here.

Same for *BNI Franchising.* The 40-50% minimum language cited in *BNI Franchising* originally comes from *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir 2001). 2026 WL 818331, at *19. But the *Microsoft* language does not support a minimum foreclosure percentage for three reasons:

1. The language is dicta. *Microsoft* did not actually dismiss any claims based on the alleged foreclosure percentage being lower than the 40 to 50 percent range. *See* 253 F.3d at 70-71. In fact, the court in *Microsoft* affirmed liability where a foreclosure percentage was not quantified. *Id*. at 70-71 (contracts foreclosed majority of one of multiple channels for distributing a product tied to the one at issue).

2. Even if the language were not dicta, the *Microsoft* also included the word "usually." The *Microsoft* court did not say that "40% or 50%" is a necessary requirement Section 1 plaintiffs must meet; it said "the roughly 40% or 50% share *usually* required" for a Section 1 claim. *Id.* (emphasis added). So, alleged foreclosure of less than 40 to 50 percent is not grounds for dismissal.

3. *Microsoft* was decided after trial, not a motion to dismiss, and so gives no help here.[4]

For similar reasons, at least one court bound by *Microsoft* in the District of Columbia has held that "an alleged foreclosure of 35% is not defective as a matter of law". *Am. President Lines*, 633 F. Supp. 3d at 229.

* * *

All of this confirms that there is no minimum foreclosure percentage required to allege substantial foreclosure for the purposes of an exclusive dealing claim.

**CONCLUSION**

The State respectfully urges this Court (a) to define the relevant market from the perspective of consumers and (b) to not require allegations that any specific minimum percentage of the market is foreclosed for exclusive dealing claims.

---

[4] Additionally, it is unclear where *Microsoft* got this standard from. The court said "the 40% standard drawn from the caselaw" but never actually specified the cases on which it was drawing. *See id*.

Dated July 21, 2026.

Respectfully submitted,

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

THOMAS D. YORK
Chief, Antitrust Division
Texas State Bar No. 24095531

BAO CUONG N. PHAM
Assistant Attorney General, Antitrust Division
Texas State Bar No. 24039114

 /s/Katherine S. Dannenmaier
KATHERINE S. DANNENMAIER
Assistant Attorney General, Antitrust Division
Texas State Bar No. 24125093

Office of the Texas Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 803-6803
Fax: (512) 473-8301
thomas.york@oag.texas.gov
cuong.pham@oag.texas.gov
kay.dannenmaier@oag.texas.gov

**COUNSEL FOR [PROPOSED] AMICI STATES OF TEXAS AND LOUISIANA**

*Additional counsel listed on next page.*

11

*On behalf of:*

LIZ MURRILL
Louisiana Attorney General

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 21st day of July, 2026, I caused a true and correct copy of the foregoing document to be electronically filed via the Court's ECF system, which will send notification of such filing to any counsel of record.

_/s/Katherine S. Dannenmaier_____ __
KATHERINE S. DANNENMAIER
Assistant Attorney General, Antitrust Division
Texas State Bar No. 24125093