**FILED**

August 05, 2026

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ **CM**

DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| STRIVE SPECIALTIES INC., | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | 5:26-CV-00155-MA |
| | § | |
| ELI LILLY & CO., NOVO NORDISK A/S, | § | |
| and NOVO NORDISK INC., | § | |
| | § | |
| Defendant. | § | |

**OPINION AND ORDER**

The Court now considers Defendants Novo Nordisk A/S and Novo Nordisk Inc.'s (collectively, "Novo Nordisk") Motion to Dismiss;[1] Plaintiff Strive Specialties Inc.'s ("Strive") response;[2] and Defendant Novo Nordisk's reply,[3] and well as Defendant Eli Lilly & Co.'s ("Eli Lilly") Motion to Dismiss;[4] Strive's response;[5] and Eli Lilly's reply.[6] After considering the motion, record, and relevant legal authorities, the Court **GRANTS** Defendants' Motions to Dismiss *for the reasons stated below*.

## I.    FACTUAL BACKGROUND

This is an antitrust action. Strive, a pharmaceutical manufacturer of compounded GLP-1 medications, asserts claims against Novo Nordisk for unlawful restraint of trade and agreement not to use the goods of a competitor, and against Eli Lilly for unlawful restraint of trade, agreement not to use the goods of a competitor, and market monopolization.[7]

---

[1] Dkt. No. 42.
[2] Dkt. Nos. 48, 49.
[3] Dkt. No. 52.
[4] Dkt. No. 43.
[5] Dkt. No. 47.
[6] Dkt. No. 51.
[7] Dkt. No. 41, at ¶¶ 232–263.

Assuming the facts in Strive's complaint to be true, Strive is a state-licensed pharmaceutical manufacturer of compound drugs, chiefly glucagon-like peptide-1 medications ("GLP-1 medications"), a drug that assists with metabolic control and appetite regulations. The Food and Drug Administration ("FDA") has approved several GLP-1 medications for weight loss and for the management of blood glucose levels and metabolic function in individuals with type-2 diabetes.[8]

Novo Nordisk and Eli Lilly manufacture numerous FDA-approved GLP-1 medications. Nordisk produces Ozempic, approved for the treatment of type-2 diabetes, and Wegovy, approved for weight loss.[9] Eli Lilly produces exenatide, marketed as Byetta, for the treatment of type-2 diabetes.[10] Eli Lilly also manufactures tirzepatide, a GLP-1 receptor agonist with a distinct active ingredient, marketed as Mounjaro for type-2 diabetes and Zepbound for weight loss.[11]

There is an extremely high demand for GLP-1 medications in the United States, with sales exceeding $40 billion in 2025.[12] Together, Eli Lilly and Novo Nordisk control a significant portion of the market for branded GLP-1 medications in the United States.[13] The production and sale of branded GLP-1 medications has proven highly profitable for Eli Lilly and Novo Nordisk, who offer their products for prices in excess of $1,000 per month.[14]

FDA approval is often "extremely costly and time-intensive," and approved drugs are standardized in their dosage, delivery methods, and specifications under a "one-size-fits-most" approach designed to meet the needs of an "average patient."[15] Defendants' branded GLP-1

---

[8] Dkt. No. 41, at ¶¶ 19–30, 54, 65.
[9] Dkt. No. 41, at ¶ 29.
[10] Dkt. No. 41, at ¶¶ 27, 30.
[11] Dkt. No. 41, at ¶ 30.
[12] Dkt. No. 41, at ¶ 46.
[13] *See* Dkt. No. 41, at ¶¶ 31–32.
[14] *See* Dkt. No. 41, at ¶¶ 41, 44–47.
[15] Dkt. No. 41, at ¶ 59.

medications, for example, are "sold only in pre-filled injection pens or single-size pills."[16] When an FDA-approved medication is unsuitable for a patient—for example, due to allergies, delivery needs, or drug interactions—a licensed prescriber may prescribe a compounded version by modifying the drug's active ingredient to meet that patient's needs.[17] A significant portion of the prescriptions for compound GLP-1 medications are issued to patients via telehealth provider services.[18] Compounding pharmacies have "increased in scale commensurate with the rise of telehealth providers," in large part through arrangements wherein compound pharmacies partner with telehealth providers to "fulfill doctors' prescriptions for large numbers of patients based on individual need and on a national basis," allowing compounding pharmacies to "scale operations beyond the local environments where they had traditionally competed[.]"[19]

Under ordinary circumstances, a compound pharmacist may only produce a limited quantity of compound medications in response to a prescription from a licensed prescriber finding that a compound form of a medication is "necessary."[20] They cannot produce "regularly or in inordinate amounts . . . any drug products that are essentially copies of a commercially available drug product."[21] This restriction is lifted during a drug "shortage," defined as a period when demand or projected demand in the United States exceeds supply.[22] In such cases, the FDA places the drug on a national shortage list, and authorized compounding pharmacists may produce drugs that are "essentially copies" of approved products until the FDA determines that manufacturers can meet demand and removes the drug from the list.[23]

---

[16] Dkt. No. 41, at ¶ 75.
[17] Dkt. No. 41, at ¶¶ 60–68, 70–75.
[18] Dkt. No. 41, at ¶¶ 79–87.
[19] Dkt. No. 41, at ¶ 82.
[20] *See* 21 U.S.C. § 353a(a).
[21] 21 U.S.C. § 353a(b)(1)(D).
[22] 21 U.S.C. §§ 353b(a)(2)(A)(ii), 356c(h)(2).
[23] 21 U.S.C. §§ 353b(a)(2)(A)(ii), (a)(5), (d)(2)(A); *see also* Dkt. No. 41, at ¶ 92.

Strive alleges that "[f]rom 2022 through March 2025, Eli Lilly and Novo Nordisk's branded GLP-1 [medications] were added to the FDA's drug shortage list . . . [because they] could not produce enough product for pharmacies to fulfill all U.S. prescriptions for GLP-1 drugs."[24] During that time, numerous compounding pharmacies began to produce "copies" of Defendants' branded GLP-1 medications."[25] Strive alleges that "[d]uring this time, prescriber demand for personalized compounded versions of GLP-1 drugs also continued to grow" independently of these GLP-1 medication "copies" as telehealth services continued to expand.[26] Thus, Strive alleges, when the FDA removed Defendants' branded GLP-1 medications from the national shortage list, "the need for tailored or 'personalized' compound GLP-1 [medications] remained high," with compound pharmacies fulfilling approximately 10% of the "for-cash market for GLP-1 drugs."[27]

Strive alleges that, beginning in late 2024, Eli Lilly and Novo Nordisk began to use their market power to foreclose compounding facilities from accessing patient markets by limiting their access to telehealth distribution channels. Eli Lilly launched its own online telehealth-like pharmacy, LillyDirect, on January 4, 2024,[28] in an effort to connect patients with prescribers and facilitate home delivery of Lilly's branded GLP-1 medications.[29] Novo Nordisk launched its own direct-to-patient online pharmacy, NovoCare Pharmacy, wherein it offered substantial discounts on Wegovy and other GLP-1 drugs, allegedly in an explicit effort to compete with compounding pharmacies in the for-cash GLP-1 market.[30]

---

[24] Dkt. No. 41, at ¶ 91.
[25] Dkt. No. 41, at ¶¶ 93–96.
[26] Dkt. No. 41, at ¶¶ 93–97.
[27] Dkt. No. 41, at ¶¶ 99–101.
[28] Dkt. No. 41, at ¶ 106.
[29] *See* Dkt. No. 41, at ¶¶ 105–107.
[30] *See* Dkt. No. 41, at ¶¶ 108–111.

In late 2024 and early 2025, Eli Lilly and Novo Nordisk also entered into "partnerships" with various telehealth providers.[31] Strive alleges that these agreements were premised on the understanding that the contracting telehealth providers would cease working with compounding pharmacies to fulfill prescriptions for compound GLP-1 medications, even when a prescribing physician had written a prescription for a compound drug.[32] Because telehealth providers allegedly account for roughly half of all cash-pay GLP-1 prescriptions and operate at national scale, Strive contends that these exclusive-dealing arrangements significantly restrict prescriber and patient access to compound medications and unlawfully limit demand for compound GLP-1 products.[33]

Strive also alleges that Defendants have engaged in numerous other "anticompetitive" behaviors. For example, Strive alleges that Novo Nordisk has "sent letters to doctors demanding that they cease 'unlawful participation in distribution of compound GLP-1 medicines, [] insinuating . . . that compounding of individualized GLP-1 drugs under Section 503A is illegal."[34] Strive further alleges that Eli Lilly has described compound medications as "never safe to use," and "has dedicated an entire section of its company website to . . . addressing [compound drugs] in connection with 'counterfeit' and 'fake' medications and characterizing them as 'risky' and 'unproven.'"[35] Eli Lilly has also allegedly interfered with compounding pharmacies' relationships with patients, payment processors, and platforms through warning letters, regulatory pressure, and influence over accreditation bodies, leading to the removal of online communicates discussing compound medications on social media and allegedly reducing Strive's ability to operate and attract patients.[36]

---

[31] Dkt. No. 41, at ¶¶ 114–115.
[32] Dkt. No. 41, at ¶¶ 113–117, 114–133.
[33] Dkt. No. 41, at ¶¶ 122–123, 129, 133, 137.
[34] Dkt. No. 41, at ¶ 135.
[35] Dkt. No. 41, at ¶¶ 144, 147.
[36] Dkt. No. 41, at ¶¶ 150–169, 171-174.

Strive alleges that these behaviors have blocked it from essential channels of commerce, reducing its access to the market for GLP-1 medications and limiting physician and patient choice, thereby suppressing competition in the greater GLP-1 market, particularly the GLP-1 cash-pay segment of the market, where telehealth-driven demand is most significant.[37]

## II.   PROCEDURAL BACKGROUND

Strive commenced this action on January 14, 2026, and amended its complaint on April 3, 2026.[38] Pursuant to the Court's Order setting a motion to dismiss briefing schedule,[39] Defendants filed their Motions to Dismiss on April 28, 2026.[40] Eli Lilly filed a motion to stay proceedings pending the Court's ruling on Defendants' motions to dismiss,[41] which the Court granted on June 22, 2026.[42]

Strive filed its responses to Defendants motions on May 28, 2026,[43] and Defendants timely replied.[44] The motions are now ripe for review.

## III.   DISCUSSION

### a.  Jurisdiction

This Court has jurisdiction under 28 U.S.C. § 1331. Strive brings this action under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act.[45] Jurisdiction is therefore properly invoked in this Court.

---

[37] Dkt. No. 41, at ¶¶ 122, 129, 133, 137.
[38] Dkt. No. 41.
[39] Dkt. No. 36.
[40] Dkt. Nos. 42, 43.
[41] Dkt. No. 46.
[42] Dkt. No. 53.
[43] Dkt. Nos. 48, 49.
[44] Dkt. Nos. 51, 52.
[45] 15 U.S.C. §§ 1–2, 14.

Defendant Eli Lilly moves to dismiss under Rules 12(b)(1) and 12(b)(6), asserting that Strive lacks "both constitutional and antitrust standing."[46] Despite this cursory reference to constitutional standing, Eli Lilly's argument addresses only antitrust standing, which is distinct from Article III standing and evaluated under Rule 12(b)(6).[47] The Court therefore proceeds with analysis of both motions under Rule 12(b)(6).

### b. Legal Standards

To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."[48] This does not require detailed factual allegations, but it does require "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."[49] Courts first disregard from their analysis any conclusory allegations as not entitled to the assumption of truth,[50] but regard well-pled facts as true, viewing them in the light most favorable to the plaintiff.[51] Courts then undertake the "context-specific" task of determining whether the remaining well-pled allegations give rise to an entitlement to relief that is plausible, rather than merely possible or conceivable.[52]

---

[46] Dkt. No. 43, at 1,

[47] Dkt. No. 43, at 16–18; *see Rx Sols., Inc. v. Caremark, L.L.C.*, 164 F.4th 436, 443–44 (5th Cir. 2026) (analyzing antitrust injury under Rule 12(b)(6) standards).

[48] *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), *cert. denied*, 552 U.S. 1182 (2008) (internal quotation marks omitted)).

[49] *Twombly*, 550 U.S. at 555.

[50] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

[51] *Id.*

[52] *See id.* at 679–80.

c.  **Sherman Act Claims**

i.  *Relevant Market*

Strive asserts claims against Novo Nordisk for unlawful restraint of trade in violation of Section 1 of the Sherman Act, and against Eli Lilly for both unlawful restraint of trade and monopolization in violation of Sections 1 and 2.[53]

As a threshold matter, a plaintiff asserting claims under these provisions must plausibly define the relevant market of competition in which antitrust activity is occurring.[54] "The relevant market has two components: a product market and a geographic market."[55] Courts assess the "relevant geographic market" by examining the "area of effective competition" in light of the industry's "commercial realities."[56] To determine the "relevant product market," courts consider the extent to which a product is "interchangeable in use" and the degree of "cross-elasticity of demand" between the product and its substitutes.[57] A product market may include submarkets, which are identified by "practical indicia" such as "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."[58]

Strive alleges, and Defendants do not contest,[59] that the relevant geographic market is the entire United States, as manufacturers of both branded and compound GLP-1 medications

---

[53] Dkt. No. 41, at ¶¶ 232–247, 253–258.
[54] *Rx*, 164 F.4th at 442 (quoting *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453–54 (5th Cir. 2021); *see also New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1036 (5th Cir. 2023) ("A district court can dismiss Sherman Act claims for failure to properly define the relevant market.").
[55] *Rx*, 164 F.4th at 442 (citing *Shah*, 985 F.3d at 454).
[56] *Rx*, 164 F.4th at 443 (citations and internal quotation marks omitted).
[57] *Rx*, 164 F.4th at 443 (quoting *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 626 (5th Cir. 2002) (citing *C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1245 (5th Cir.1985)).
[58] *Rx*, 154 F.4th at 443 (internal citations omitted).
[59] *See* Dkt. Nos. 42, at 12–14; 43, at 18–20.

distribute their products to patients nationwide.[60] As to the relevant product market, Strive proposes two potential markets for this action: (1) the entire national market for GLP-1 medications used to treat obesity and chronic weight management, and (2) a national submarket for GLP-1 medications used to treat obesity and chronic weight management which are purchased by patients out-of-network "for cash."[61]

Strive alleges that a national GLP-1 market is appropriate because other weight loss products "are not reasonable substitutes for GLP-1 drugs for the treatment of obesity and chronic weight management." [62] Strive notes that, unlike any other weight management medication, GLP-1 medications "have dual mechanisms of action: metabolic control and appetite regulation."[63] Strive further alleges that prescribing physicians and consumers do not generally view other weight-loss drugs as alternatives to GLP-1 medications and notes the relative inelasticity of demand for GLP-1 medications, alleging that GLP-1 medications consistently command higher prices than other available weight-loss drugs.[64]

As to its proposed cash-pay submarket, Strive alleges that although private insurance, Medicare, and Medicaid generally cover GLP-1 medications when prescribed for type-2 diabetes, GLP-1 medication coverage for obesity and weight loss is often unavailable or heavily restricted through prior authorization requirements and body mass index thresholds.[65]

---

[60] Dkt. No. 41, at ¶¶ 175–181.

[61] Dkt. No. 41, at ¶¶ 182–223. The Court observes, however, that apart from this section's reference to the broader GLP-1 market for obesity and chronic weight management, the Complaint otherwise appears to rely exclusively on Strive's proposed alternative submarket. *See, e.g.*, Dkt. No. 41, at ¶¶ 224–226, 228–229, 233–235, 238–241, 243–246, 249–252, 254–257, 260–264. The Court nevertheless proceeds with analysis of both markets.

[62] Dkt. No. 41, at ¶ 184.

[63] Dkt. No. 41, at ¶ 185.

[64] Dkt. No. 41, at ¶¶ 188–189.

[65] Dkt. No. 41, at ¶¶ 203–205.

Defendants do not challenge Strive's first proposed product market.[66]  Instead, they focus their arguments on the alleged deficiencies in Strive's proposed cash-pay submarket. Defendants first contend that the proposed submarket is underinclusive because it improperly "gerrymanders" the broader GLP-1 market based solely on method of payment.[67] They further argue that the proposed submarket is overinclusive because it places compound GLP-1 medications in the same market as branded GLP-1 medications where Defendants contend the products are not reasonably interchangeable.[68]

The Court need not address Defendants' argument that the portion of a medication market available to individuals without insurance coverage for the medication cannot, as a matter of law, constitute a distinct submarket for that medication. An antitrust market is defined from the perspective of the consumer, not the market participants.[69] From that perspective, payment method may materially affect purchasing decisions, particularly where a medication is not immediately necessary and must be paid out of pocket. Given the variability and frequent limitations of insurance coverage for GLP-1 medications prescribed for weight management, it is plausible that a meaningful subset of consumers lack an avenue to access GLP-1 medications via insurance and may as a result constitute a distinct customer base. Similarly, Strive's proposed submarket for both patients seeking GLP-1 medications for medically indicated obesity and those seeking them for general weight loss may be overbroad depending on the extent to which the market experience of

---

[66] *See* Dkt. Nos. 42, at 12–14; 43, at 18–20.

[67] *See* Dkt. Nos. 42, at 13–14; 43, at 20–21.

[68] *See* Dkt. Nos. 42, at 15–16; 43, at 19–20. The Court notes that Novo Nordisk raises this argument in a different section of its motion to dismiss, in which it contends that Strive has failed to allege a viable antitrust injury. Because the argument in substance challenges Strive's assertion that its products and Novo Nordisk's compete in the same product market, the Court addresses it here.

[69] *PSKS, Inc. v. Leegin Creative Leather Prods. Inc*., 615 F.3d 412, 414 (5th Cir. 2010) (citing *United States v. E.I. du Point Nemours & Co.*, 351 U.S. 377, 395 (1956)).

these two groups of patients overlap. The Court need not consider this issue further, however, because Strive fails to allege a plausible product market on other grounds.

When a medication is not listed on the national shortage list, compounded medications for that drug may only be produced when a licensing physician has found them "necessary" to meet the needs of a particular patient.[70] Strive alleges that there are "many reasons that a licensed physician might prescribe compounded medicine," including allergies, the need for dosage variations, or a clinical determination that "the patient would benefit from a different means of application or delivery than the branded version makes available," as well as circumstances in which treatment "may involve a combination of drugs that is better prepared in a compounded form."[71] But as Strive itself acknowledges, all of these determinations are ultimately a finding that a branded medication is incapable of meeting a patient's specific medical needs.[72] Because compound GLP-1 medications are only available to patients that cannot use branded GLP-1 medications as a matter of medical necessity, they cannot reasonably be understood as an interchangeable substitute for branded GLP-1 medications in the ordinary sense of market competition.[73] Accordingly, Strive cannot plausibly allege that its products are interchangeable with Defendants' branded GLP-1 medications.

In addition to this, the Court also notes that Strive's pleadings regarding its proposed market do not allege that its GLP-1 products function as meaningful substitutes for branded GLP-1 medications, "with reference to . . . cross-elasticity of demand."[74] Strive offers only conclusory assertions that its products exert "competitive pressure" on Defendants' pricing because

---

[70]  21 U.S.C. § 353a(a).
[71] Dkt. No. 41, at ¶ 71.
[72] Dkt. No. 41, at ¶¶ 5, 62, 100–102; *see* 21 U.S.C. § 353a(a).
[73] Dkt. No. 41, at ¶ 5; *see* 21 U.S.C. § 353a(a).
[74] *R*x, 164 F.4th at 443 (internal citations omitted).

compounded GLP-1 medications are sold at lower prices.[75] But a price disparity does not imply cross-elasticity between two products unless consumers can substitute one for the other in response to that disparity.[76] Strive's allegation that Defendants have attempted to prevent it from accessing the market to prevent Strive's compound GLP-1 medications from "taking away potential business from [Defendants'] branded GLP-1 drugs" is not reconcilable with the fact that the decision to use compounded medication is not driven by ordinary consumer preference.[77] Absent a foundational showing that the two products are meaningful market alternatives, considerations such as relative price, safety, or effectiveness can have little bearing on whether two products share a market.

In light of the foregoing, the Court finds that Strive has failed to plausibly allege reasonable interchangeability or cross-elasticity of demand between its compounded products and Defendants' branded GLP-1 medications, and, therefore, fails to plausibly allege the necessary legally cognizable product market to bring its antitrust claims.

### ii.   Antitrust Injury

Although Strive's failure to plead a relevant market is independently dispositive, the Court briefly addresses Strive's alleged antitrust injuries.

To establish antitrust injury, a plaintiff must allege harm "of the type the antitrust laws were intended to prevent" that flows from the challenged conduct.[78] This inquiry is distinct from Article III injury and is "narrowly interpreted" in this Circuit.[79] Critically, the antitrust laws protect

---

[75] *See, e.g.*, Dkt. No. 41, at ¶¶ 4, 224(f).

[76] *See Endure Indus., Inc. v. Vizient Inc.*, 164 F.4th 405, 411 (5th Cir. 2026) (quoting *United Farmers Agents Ass'n v. Farmers Ins. Exch.*, 89 F.3d 233, 236 n.3 (5th Cir. 1996)) ("The cross-elasticity of demand for substitutes measures consumers' propensity to switch from one product to another, similar product when relative prices change.").

[77] Dkt. No. 41, at ¶ 102.

[78] *Rx*, 164 F.4th at 443; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

[79] *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC")*, 459 U.S. 519, 535 n.31 (1983); *Rx*, 164 F.4th at 444 (quoting *Anago, Inc. v. Tecnol Med. Prods., Inc.*, 976 F.2d 248, 249 (5th Cir. 1992); *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 489 (5th Cir. 2022)).

competition—not individual competitors—and losses attributable to ordinary competitive forces do not suffice.[80]

Strive alleges that Defendants engaged in "conduct that has separately and collectively harmed competition" by: (a) "[s]ubstantially foreclosing competition"; (b) "[e]xcluding compounding pharmacies from effective distribution channels and denying compounding pharmacies the prescriptions necessary to further scale operations and compete"; (c) [i]ncreasing barriers to entry and excluding compounding pharmacy rivals by increasing the cost of capital for efforts to scale operations"; (d) [i]ncreasing prices for patients"; (e) [m]arginalizing the ability of compounding pharmacies to serve patients with prescriptions for compounded GLP-1 drugs, which removes any meaningful alternative for those patients"; (f) [r]emoving the competitive pressure compounding pharmacies bring to bear, which enables Eli Lilly to continue charging supracompetitive prices for branded GLP-1 drugs"; (g) [r]educing prescriber and patient choice and access to products that are otherwise easily and safely personalized to meet individual patients' unique circumstances . . ."[81] Strive further alleges that Eli Lilly further "[l]imit[ed] prescriber and patient demand for compounded GLP-1 medications by making false accusations about the nature and safety of compounded drugs[.]"[82]

Measured against this Circuit's standard, the Court finds that Strive's alleged injuries largely reflect harm to its own ability to compete, not to competition itself. Strive's assertion that Defendants foreclosed distribution channels, denied it access to patients, reduced demand for its products, increased scaling costs, or otherwise impeded Strive's participation in the market describe injury to Strive as a market participant, not to the competitive process.[83]

---

[80] *Rx*, 164 F.4th at 444 (quoting *Anago*, 976 F.2d at 249; *Pulse*, 30 F.4th at 489).
[81] Dkt. No. 41, at ¶¶ 224, 229.
[82] Dkt. No. 41, at ¶ 224(h).
[83] *See* Dkt. No. 41, at ¶¶ 224(a)–(c), (e), 229(a)–(c), (e).

Strive's remaining theories fare no better. Its claim of reduced patient or prescriber "choice" is unpersuasive, as access to compounded medications is governed by medical necessity and regulatory constraints, not consumer preference.[84] Strive's remaining allegations of higher prices, targeting smear campaigns, and diminished "competitive pressure"[85] rest on an implausible theory of competition between non-interchangeable products. As the Court has already discussed, Strive has not plausibly alleged that compounded GLP-1 medications compete in the same product market as Defendants' branded drugs. Absent any such showing, Strive's allegation that Defendants systematically eliminated compounded products from the market may implicate other legal theories, but it does not amount to antitrust injury. Accordingly, the Court concludes that Strive has failed to allege any cognizable antitrust injury.

### d. Clayton Act

Strive also asserts individual but identical claims against Defendants under Section 3 of the Clayton Act, alleging that Defendants "used [their] disparate bargaining power to force telehealth providers into supply agreements that bar telehealth providers from procuring GLP-1 drugs from compounding pharmacies," thereby foreclosing a substantial share of the U.S. GLP-1 weight-loss cash market.[86]

To state a claim based on exclusive dealing or similar arrangements, a plaintiff must plausibly allege that the agreement's "probable effect is to foreclose competition in a substantial share of the line of commerce affected."[87] In order to demonstrate this, a plaintiff must first show that it participates in the same "line of commerce" as the defendant—meaning it competes within

---

[84] Dkt. No. 41, at ¶¶ 224(g), 229(g).
[85] Dkt. No. 41, at ¶¶ 224(d), (f), (h); 229(d), (f).
[86] Dkt. No. 41, at ¶¶ 251–252, 262–263.
[87] *Apani*, 300 F.3d at 625 (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327–28 (1961)).

the same relevant product and geographic markets as defendant.[88] For the reasons already discussed, Strive has not plausibly alleged that it competes with Defendants in any cognizable branded GLP-1 product market. Absent such competition, Strive cannot establish foreclosure of competition within a relevant line of commerce, and its Clayton Act claims therefore fail.

### IV.    CONCLUSION AND HOLDING

For the foregoing reasons, Defendant Eli Lilly & Company and Defendants Novo Nordisk Inc. and Novo Nordisk A/S's Motions to Dismiss are **GRANTED**. Plaintiff Strive Specialties, Inc.'s claims are **DISMISSED WITH PREJUDICE**.

IT IS SO ORDERED.

DONE this 3rd day of August, 2026, in San Antonio, Texas.

_____
MICAELA ALVAREZ
SENIOR UNITED STATES DISTRICT JUDGE

---

[88] *See Apani*, 300 F.3d 620, 625–26 (5th Cir. 2002) (internal citations omitted).