**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| STRIVE SPECIALTIES INC.,<br><br>*Plaintiff,*<br><br>v.<br><br>ELI LILLY & CO.,<br>NOVO NORDISK A/S, and<br>NOVO NORDISK INC.<br><br>*Defendants.* | Case No. 5:26-cv-00155-MA |

**PLAINTIFF STRIVE SPECIALTIES INC.'S MOTION TO ALTER OR AMEND THE JUDGMENT AND FOR RECONSIDERATION OR, IN THE ALTERNATIVE, FOR LEAVE TO AMEND**

# TABLE OF CONTENTS

Page

INTRODUCTION ........ 1

BACKGROUND ........ 1

LEGAL STANDARD ........ 3

ARGUMENT ........ 3

A. Dismissal Rests on a Misreading of Section 503A and Its Relationship to Market Definition ........ 4

B. The FAC Plausibly Alleges A Cash-Pay Market of Branded and Compounded GLP-1 Medications for Weight Management ........ 8

1. Antitrust Law Requires Reasonable Interchangeability, Not Identical Products or Internal Cross-Substitution ........ 8

2. The FAC Alleges Both Market Realities and Direct Evidence Demonstrating Competition Between Branded and Compounded GLP-1 Medications ........ 11

3. Market Definition Should Not Be Resolved on the Pleadings ........ 13

C. Strive's Clayton Act Claims Should Be Reinstated For the Same Reason ........ 14

D. Correcting the Market-Definition Analysis Also Requires Reconsideration of Antitrust Injury ........ 15

E. At Minimum, Strive Should Be Granted Leave to Amend ........ 17

CONCLUSION ........ 18

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Austin v. Kroger Tex., L.P.*,
864 F.3d 326 (5th Cir. 2017) .......... 18

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) .......... 7, 10, 11

*Brunswick Corp. v. Pueblo-Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) .......... 16

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) .......... 6

*Dr.'s Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
123 F.3d 301 (5th Cir. 1997) .......... 16

*Dr.'s Hosp. of Laredo v. Cigarroa*,
No. SA-21-CV-01068-XR, 2022 WL 3567353 (W.D. Tex. Aug. 17, 2022) .......... 8

*Eli Lilly & Co. v. Revive Rx, LLC*,
812 F. Supp. 3d 708 (S.D. Tex. 2025) .......... 6, 7

*Endure Indus., Inc. v. Vizient Inc.*,
164 F.4th 405 (5th Cir. 2026) .......... 8

*eTool Dev., Inc. v. Nat'l Semiconductor Corp.*,
881 F. Supp. 2d 745 (E.D. Tex. 2012) .......... 3

*Foman v. Davis*,
371 U.S. 178 (1962) .......... 3, 17

*FTC v. Cardinal Health, Inc.*,
12 F. Supp. 2d 34 (D.D.C. 1998) .......... 12

*Geneva Pharms. v. Barr Labs. Inc.*,
386 F.3d 485 (2d Cir. 2004) .......... 13

*George v. SI Grp., Inc.*,
36 F.4th 611 (5th Cir. 2022) .......... 4

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*,
313 F.3d 305 (5th Cir. 2002) .......... 3, 17

*Hart v. Bayer Corp.*,
199 F.3d 239 (5th Cir. 2000) .......... 3, 17

*Hawaii v. Standard Oil Co.*,
405 U.S. 251 (1972) .......... 16

*Illumina, Inc. v. FTC*,
88 F.4th 1036 (5th Cir. 2023) .......... 8, 9, 11

*Koch Agronomic Servs., LLC v. Eco Agro Res. LLC*,
No. 1:14-CV-679, 2015 WL 5712640 (M.D.N.C. Sept. 29, 2015) .......... 9, 10

*Marucci Sports, LLC v. Nat'l Collegiate Athletic Ass'n*,
751 F.3d 368 (5th Cir. 2014) .......... 3, 17

*Med. Ctr. Pharmacy v. Mukasey*,
536 F.3d 383 (5th Cir. 2008) .......... 6

*Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd.*,
838 F.3d 421 (3d Cir. 2016) .......... 12

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018) .......... 7, 8, 10

*ProMedica Health Sys., Inc. v. FTC*,
749 F.3d 559 (6th Cir. 2014) .......... 10, 11

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003) .......... 17

*Rothery Storage & Van Co. v. Atlas Van Lines*,
792 F.2d 210 (D.C. Cir. 1986) .......... 12

*RX Solutions, Inc. v. Caremark, L.L.C.*,
164 F.4th 436 (5th Cir. 2026) .......... 13

*Tesla, Inc. v. La. Auto. Dealers Ass'n*,
113 F.4th 511 (5th Cir. 2024) .......... 16

*United Farmers Agents Ass'n v. Farmers Ins. Exch.*,
89 F.3d 233 (5th Cir. 1996) .......... 8

*United States v. Cont'l Can Co.*,
378 U.S. 441 (1964) .......... 10

*United States v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956) .................................................................... 7, 8, 9, 10

*United States v. Energy Solutions, Inc.*,
265 F. Supp. 3d 415 (D. Del. 2017) ........................................................ 11

*United States v. Evers*,
643 F.2d 1043 (5th Cir. 1981) ................................................................ 6

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966) ............................................................................ 10

*Waltman v. Int'l Paper Co.*,
875 F.2d 468 (5th Cir. 1989) .................................................................. 3

*WorkSTEPS, Inc. v. ErgoScience, Inc.*,
88 F. Supp. 3d 752 (W.D. Tex. 2015) ...................................................... 3

*Yoder Bros., Inc. v. Cal.-Fla. Plant Corp.*,
537 F.2d 1347 (5th Cir. 1976) ................................................................ 9

**Statutes**

21 U.S.C. § 353a............................................................................ *passim*

21 U.S.C. § 353a(a) ............................................................................ 5

21 U.S.C. § 353a(b)(2)(A) ................................................................... 5, 7

Food & Drug Admin., U.S. Dep't of Health & Hum. Servs.,
*Compounded Drug Products That Are Essentially Copies of a Commercially Available Drug Product Under Section 503A of the Federal Food, Drug, and Cosmetic Act: Guidance for Industry* 8-9
(2018) ................................................................................................ 5

**Rules**

Fed. R. Civ. P. 15(a)(2)...................................................................... 3,

Fed. R. Civ. P. 54(b) ............................................................................ 3

Fed. R. Civ. P. 59(e) ............................................................................ 3

**Other**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (2026) ........................................................ 8

## INTRODUCTION

Plaintiff Strive Specialties Inc. ("Strive") respectfully requests that the Court reconsider its August 3, 2026 Opinion and Order (Doc. 55) dismissing Strive's First Amended Complaint (the "FAC") with prejudice. The Court's decision rests on the incorrect premise that, "[b]ecause compound[ed] [sic] GLP-1 medications are only available to patients that cannot use branded GLP-1 medications **as a matter of medical necessity**, they cannot reasonably be understood as an interchangeable substitute for branded GLP-1 medications in the ordinary sense of market competition." Doc. 55 at 11 (emphasis added). That premise contradicts both the text of the Federal Food, Drug, and Cosmetic Act (the "FDCA"), 21 U.S.C. § 353a ("Section 503A"), and the factual allegations in the complaint. Correcting that premise changes the Court's market definition, antitrust injury, and Clayton Act analyses.

At minimum, if the Court remains persuaded that additional detail is necessary to make out viable claims, Strive respectfully requests leave to file a Second Amended Complaint, attached hereto as Ex. 1. The Court's Opinion and Order dismissed all claims with prejudice without a separate futility analysis, despite Strive never having amended its pleadings in response to the Court's market definition analysis.

## BACKGROUND

Strive is a compounding pharmacy that dispenses compounded GLP-1 medications prescribed for individual patients. Doc. 41 ¶¶ 7, 14, 57-79. Eli Lilly and Novo Nordisk manufacture branded GLP-1 medications, including Zepbound, Mounjaro, Wegovy, and Ozempic. *Id.* ¶¶ 30-36. Compounded and branded GLP-1 products compete for the same cash-paying consumer patients. *Id.* ¶ 104 (Lilly admitting compounded "diverts" branded GLP-1 medications); *id.* ¶ 103 (Novo admitting compounders "took . . . business away" from branded GLP-1 manufacturers).

The FAC alleges that GLP-1 medications constitute a distinct product category and identifies two relevant markets: (1) GLP-1 medications used to treat obesity and chronic weight management; and (2) the cash-pay market for those products. *Id.* ¶¶ 182-223. It further alleges that compounding pharmacies compete in those markets when physicians prescribe personalized GLP-1 medications to meet individual patient needs. *Id.* ¶¶ 70-76, 200, 213.

As relevant here, the FAC alleges that physicians may prescribe compounded GLP-1 medications based on patient-specific considerations, including dosage requirements, allergies, side effects, delivery needs, and combination therapies. *Id.* ¶¶ 71-75. Or, in other words, compounded medications are available to patients based on a prescriber's assessment of the clinical needs of the patient rather than "medical necessity." Clinicians make the same clinical assessment in determining whether to prescribe branded versions of GLP-1 drugs. The FAC further alleges that physicians prescribe both branded and compounded GLP-1 products, that telehealth providers historically facilitated access to both, and that compounding pharmacies continued to serve a meaningful portion of the cash-pay GLP-1 market after the shortage ended. *Id.* ¶¶ 80-101.

The Court dismissed the FAC. Although it did not reject the alleged geographic market and acknowledged that cash-pay GLP-1 patients may constitute a distinct customer group, it concluded that compounded and branded GLP-1 medications are not plausible substitutes because compounded products are available only to patients who cannot use branded products. Doc. 55 at 10-12. The Court then dismissed Strive's Clayton Act Section 3 and antitrust injury claims on the same premise. Doc. 55 at 14-15.

Strive's motion for reconsideration follows.

## LEGAL STANDARD

Federal Rule of Civil Procedure 54(b) gives a district court discretion to "revise[] at any time before the entry of a judgment" "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties [.]" Fed. R. Civ. P. 54(b).[1] Although Rule 54(b)'s standard is flexible, courts in this Circuit generally apply many of the same considerations that govern Rule 59(e) motions. *See eTool Dev., Inc. v. Nat'l Semiconductor Corp.*, 881 F. Supp. 2d 745, 748 (E.D. Tex. 2012) (collecting cases); *see also WorkSTEPS, Inc. v. ErgoScience, Inc.*, 88 F. Supp. 3d 752, 758 (W.D. Tex. 2015). As such, motions for reconsideration "serve the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *Waltman v. Int'l Paper Co.,* 875 F.2d 468, 473 (5th Cir. 1989).

Under Federal Rule of Civil Procedure 15, courts should "freely give" leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). Relevant considerations include undue delay, bad faith, repeated failure to cure deficiencies, undue prejudice, and futility. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Marucci Sports, LLC v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014). In assessing whether dismissal with prejudice is appropriate, courts also consider whether the plaintiff has had a meaningful opportunity to cure pleading deficiencies. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329-30 (5th Cir. 2002); *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000).

## ARGUMENT

The Court inferred that compounded GLP-1 medications are available only when branded medicines cannot be used, despite allegations that physicians

---

[1] Because no final judgment has been entered, the Court retains inherent authority to reconsider and revise the Opinion and Order dismissing Strive's FAC. Strive also seeks relief under Rule 59(e) to the extent applicable, without conceding that the challenged order constitutes a final judgment for purposes of appeal.

prescribe compounded medications for individualized patient needs. (Doc. 55 at 11.) That inference contradicts the FAC and improperly resolves a factual dispute against Strive. *See George v. SI Grp., Inc.*, 36 F.4th 611, 619 (5th Cir. 2022) ("[W]ell-pleaded factual allegations of a complaint must be taken as true and viewed in the light most favorable to the plaintiff.").

The error stems from the Court's interpretation of Section 503A of the FDCA. In dismissing Strive's complaint, the Court erroneously construed Section 503A to mean that compounded GLP-1 medications are available only when branded products cannot be used, and then treated that conclusion as dispositive of market definition. But Section 503A says no such thing. Regardless, the FAC alleges commercial realities that contradict the Court's construction of Section 503A.

More broadly, the FDCA also does not determine the boundaries of a market for antitrust purposes. Market definition instead turns on whether products constrain one another competitively. The FAC alleges that branded and compounded GLP-1 medications do precisely that. It alleges that those medications compete for the same patients, prescriptions, and cash-pay demand, and that Defendants themselves responded to compounders as competitive rivals.

Because the Court's contrary conclusion is premised on a reading of Section 503A that the statute does not support and an antitrust market analysis that fails to credit the Complaint's plausible allegations, reconsideration is warranted. At a minimum, Strive should be granted leave to amend.

### A. Dismissal Rests on a Misreading of Section 503A and Its Relationship to Market Definition.

The Court relied on Section 503A to conclude that, outside a shortage, compounded GLP-1 medications "may only be produced when a licensing physician has found them 'necessary'" and therefore "are only available to patients that cannot use branded GLP-1 medications as a matter of medical necessity." Doc. 55 at 11. But

Section 503A's text is broader than the narrow construction the Court adopted and, in any event, much of the FAC concerns conduct during a shortage.[2]

Section 503A authorizes compounding based on "the receipt of a valid prescription order or a notation," approved by the prescribing practitioner, that the compounded medication is "necessary for the identified patient." 21 U.S.C. § 353a(a). Section 503A also expressly contemplates situations in which a physician determines that a compounded medication differs from a commercially available medication in a way that is "significant" for an identified patient. *Id.* § 353a(b)(2)(A) (permitting compounding where a physician determines that a change between the compounded product and the commercially available product produces a "significant difference" for the identified patient).

Crucially, nothing in that language requires a finding that a patient is unable to use a branded or commercially available medication. To the contrary, the FDA has stated that "[i]t is not possible to offer exhaustive guidance about when a difference will be 'significant' to an identified individual patient," and has recognized that differences in ingredients, dosage form, or dosage strength may be significant for a particular patient despite the existence of a branded medication. Food & Drug Admin., U.S. Dep't of Health & Hum. Servs., *Compounded Drug Products That Are Essentially Copies of a Commercially Available Drug Product Under Section 503A of the Federal Food, Drug, and Cosmetic Act: Guidance for Industry* 8-9 (2018).

The Court's own summary of the FAC reflects that distinction. It recognized allegations that compounded GLP-1 medications may be prescribed to address allergies, delivery method concerns, drug interactions, dosage requirements, or combination therapy needs not met by branded products. Doc. 55 at 3, 11. Those

---

[2] The FAC alleges a shortage during 2022-2025, Doc. 41 ¶ 91, so Section 503A and its interpretation cannot be grounds for dismissal as to Defendants' challenged conduct during at least those years.

allegations describe patient-specific prescribing considerations. And while the FDCA regulates the availability of drugs, Congress did not intend it to displace physician judgment in treating individual patients. *See United States v. Evers*, 643 F.2d 1043, 1048 (5th Cir. 1981) (explaining that "Congress did not intend" the FDCA "to regulate the practice of medicine as between the physician and patient"); *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) (explaining that "the FDA is charged with . . . regulating the marketing and distribution" of medications "without intruding upon decisions statutorily committed to the discretion of health care professionals").

Properly understood, the FAC's allegations do not establish that branded GLP-1 medications must be deemed medically unusable before a physician prescribes compounded GLP-1 medication to a patient, nor do they support the conclusion that compounded medications are available only when no branded alternative can be prescribed. Instead, they reflect individualized medical considerations that may lead physicians to prescribe compounded GLP-1 medications even when a branded product remains a medically viable option.

In any event, even if Section 503A were limited to circumstances in which a physician determines that a compounded medication is "necessary" for an identified patient, that would not resolve the antitrust question presented here. Section 503A regulates when compounded medications may be lawfully dispensed. It does not define antitrust markets, nor does it provide that compounded drugs cannot compete with commercially available products.

Indeed, the FDCA contemplates the continued existence of compounded drugs alongside commercially available drugs. *See Med. Ctr. Pharmacy v. Mukasey*, 536 F.3d 383, 398 (5th Cir. 2008) (rejecting an interpretation that would render compounding "effectively unlawful" because it would conflict with statutory provisions "that expressly acknowledge the existence of compounding"); *see also Eli*

*Lilly & Co. v. Revive Rx, LLC*, 812 F. Supp. 3d 708, 719 (S.D. Tex. 2025) (recognizing that compounding is an exception to statutory "market exclusivity" protections otherwise afforded to newly approved drugs). Section 503A likewise presupposes the existence of commercially available alternatives. By authorizing compounding where a physician determines that a compounded drug differs from a commercially available product in a way that is "significant" for a particular patient, the statute necessarily recognizes that the two products coexist. 21 U.S.C. § 353a(b)(2)(A). The statute thus draws a regulatory distinction between compounded and commercially available drugs; it does not establish separate economic markets.

The Court nevertheless treated Section 503A as effectively dispositive of market definition, reasoning that because compounded medications may be dispensed only under the circumstances authorized by the statute, compounded and branded GLP-1 medications cannot compete in the same market. Doc. 55 at 11–12. But Section 503A neither defines relevant antitrust markets nor provides that lawfully compounded medications fall outside the competitive reach of commercially available drugs. Treating Section 503A as determinative of market definition therefore assigns the statute a role Congress never gave it.

Whether compounded and branded GLP-1 medications compete is instead governed by ordinary antitrust principles, including substitution and competitive constraint. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 543–44 (2018) ("*Amex*"); *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). Because the dismissal rests on the premise that Section 503A itself forecloses competition between compounded and branded GLP-1 medications, reconsideration is warranted. That premise finds no support in the text of the statute and cannot substitute for the market definition analysis required by the antitrust laws.

### B. The FAC Plausibly Alleges A Cash-Pay Market of Branded and Compounded GLP-1 Medications for Weight Management.

#### 1. Antitrust Law Requires Reasonable Interchangeability, Not Identical Products or Internal Cross-Substitution.

The Court's analysis appears to require a degree of interchangeability that antitrust law does not. Just as Apple's iPhones compete against Android devices with different capabilities, differences between products do not preclude competition between them in the same market.

A relevant market is the "area of effective competition," or the "arena within which significant substitution in consumption or production occurs." *Amex*, 585 U.S. at 543–44; *see also Dr.'s Hosp. of Laredo v. Cigarroa*, No. SA-21-CV-01068-XR, 2022 WL 3567353, at *15 (W.D. Tex. Aug. 17, 2022) ("The relevant market for an antitrust claim is the pool a court must assess to determine the ripple effect of any purported antitrust conduct on competition." (internal quotation marks omitted)). The first step in defining a relevant market is identifying a candidate market consisting of a grouping of products with similar technologies, similar costs, and interchangeable use by customers. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (2026) ¶ 536; *see also Endure Indus., Inc. v. Vizient Inc.*, 164 F.4th 405, 411 (5th Cir. 2026).[3]

Reasonable substitutability, or interchangeability of use, is assessed through cross-elasticity of demand—that is, "consumers' propensity to switch from one product to another, similar product when relative prices change." *United Farmers Agents Ass'n v. Farmers Ins. Exch.*, 89 F.3d 233, 236 n.3 (5th Cir. 1996). In practical terms, "[i]f a slight decrease in the price" of one product "causes a considerable

[3] The Fifth Circuit recognizes Areeda and Hovenkamp as "the leading antitrust commentators," *Illumina*, 88 F.4th at 1049 n.7, and has relied on their *Antitrust Law* treatise for dozens of antitrust decisions.

number of customers" to switch to another product, "it would be an indication . . . that the products compete in the same market." *du Pont*, 351 U.S. at 395.

Crucially, the concept of reasonable substitutability "is loose and flexible, requiring only that products be easily substituted in their end-use[.]" *Id.* at 394-95. Products therefore "need not be identical to be in the same market," or to qualify as reasonable substitutes. *See, e.g.*, *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1051 (5th Cir. 2023) (treating multiple DNA sequencing products as part of the same relevant market notwithstanding differences in features and capabilities); *see also Yoder Bros., Inc. v. Cal.-Fla. Plant Corp.*, 537 F.2d 1347, 1367 (5th Cir. 1976) (including differentiated flower varieties in the same relevant market).

Strive's allegations fit comfortably within that framework. The FAC alleges that branded and compounded GLP-1 medications serve the same therapeutic category, are prescribed for the same broad purposes, reach the same cash-pay patients through overlapping prescribing and telehealth channels, and compete for access to those patients. Doc. 41 ¶¶ 80-90, 182-90, 202-09.

The FAC further alleges that the same telehealth providers and prescribing networks historically facilitated patient access to both branded and compounded GLP-1 medications. *Id.* ¶¶ 80-88. Indeed, physicians evaluating patients for GLP-1 therapy may prescribe *either* a branded product *or* a compounded product depending on the patient's individualized needs, after which the prescription is sent to a pharmacy for fulfillment. *Id.* ¶¶ 86-88. And the commercial realities alleged in the FAC—supported by Defendants' admissions that GLP-1 "compounders took part of [Novo Nordisk's] business away," and "divert[ed]" patients away from Lilly's branded GLP-1s, *id.* ¶¶ 102-04—do not reflect a market in which Section 503A itself forecloses competition between compounded and branded GLP-1 medications. *See, e.g., Koch Agronomic Servs., LLC v. Eco Agro Res. LLC*, No. 1:14-CV-679, 2015 WL 5712640, at

*7 (M.D.N.C. Sept. 29, 2015) (rejecting challenge to alleged product market where complaint alleged lack of "acceptable substitutes").

The Court's analysis also appears to consider whether compounded and branded GLP-1s inside the alleged cash market are interchangeable with each other. Doc. 55 at 11. But that is not the relevant inquiry given Defendants' admissions that compounders are diverting sales from branded GLP-1 manufacturers. As the Supreme Court has explained, "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself *and substitutes for it*." *See Brown Shoe,* 370 U.S. at 325 (emphasis added). The question, then, is whether there are products outside the alleged market which are interchangeable such that they should be included in the market.

Importantly, markets commonly consist of multiple similar products due to both practical and commercial reasons. The Supreme Court has instructed, "courts should combine different products or services into a single market when that combination reflects commercial realities." *Amex*, 585 U.S. at 544 (cleaned up); *see also United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966) ("We see no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities."). And the Supreme Court and lower courts recognize markets consisting of such products, even if they are not technically interchangeable with each other.[4] Accordingly, the Fifth Circuit recently rejected a

[4] *See, e.g., Brown Shoe,* 370 U.S. at 327 (affirming district court's decision to not further subdivide the shoe market based on the finer distinction of "price/quality" and "age/sex"); *United States v. Cont'l Can Co.*, 378 U.S. 441, 457–58 (1964) (ruling products belong in the same market when they are sufficiently similar in character or in use such that they constrain each other competitively); *du Pont*, 351 U.S. at 394–95 (rejecting argument that market for flexible wrapping materials should be further sub-divided); *ProMedica Health Sys., Inc. v. FTC,* 749 F.3d 559, 565 (6th Cir. 2014) (recognizing market consisting of various medical services even though they

defendant's argument that each product within a market must be analyzed for interchangeability with each other, holding instead that they need only be "similar in character or use." *Illumina*, 88 F.4th at 1050.

Strive's allegations describe branded and compounded GLP-1 medications as similar in character and use in managing weight. The FAC plausible alleges that these products belong in the same market. And while branded and compounded GLP-1s are not perfectly identical to each other, the FAC alleges—and Defendants admit—that they compete with each other as reasonable substitutes. Doc. 41 ¶¶ 102-104. The FAC's allegations therefore provide no basis for concluding, as a matter of law, that compounded and branded GLP-1 medications belong to separate antitrust markets.

### 2. The FAC Alleges Both Market Realities and Direct Evidence Demonstrating Competition Between Branded and Compounded GLP-1 Medications.

Because market definition depends on the "commercial realities" of competition rather than formal product distinctions, courts assess reasonable interchangeability by using objective marketplace evidence. *Illumina*, 88 F.4th 1048–49. Courts examine the "practical indicia" of competition, including "industry or public recognition," "the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325. Those factors, however, are not an alternative test for market definition. Rather, they are a practical means of assessing the ultimate question: whether products constrain one another competitively because consumers view them as reasonably interchangeable alternatives.

---

are not interchangeable with each other); *United States v. Energy Solutions, Inc.*, 265 F. Supp. 3d 415, 438 (D. Del. 2017) (explaining courts "have repeatedly rejected" arguments to define markets on "refined distinctions" between the products in alleged market).

The FAC plausibly alleges precisely that type of competitive interaction. Importantly, it does not rely solely on the characteristics of compounded and branded GLP-1 medications or the circumstances under which they are prescribed. Rather, it alleges marketplace evidence showing that Defendants themselves viewed compounded GLP-1 medications as competitive alternatives to their branded products. *See, e.g.*, *Rothery Storage & Van Co. v. Atlas Van Lines*, 792 F.2d 210, 219 (D.C. Cir. 1986) (explaining that "industry or public recognition . . . matters because we assume that economic actors usually have accurate perceptions of economic realities"); *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 46 (D.D.C. 1998) ("[T]he determination of the relevant market in the end is a matter of business reality—of how the market is perceived by those who strive for profit in it." (internal alterations and quotation marks omitted)). For example, the FAC alleges that Eli Lilly and Novo Nordisk track and publicly report market shares for compounded GLP-1 medications as a separate category, reflecting the Defendants' recognition that compounded GLP-1s constitute a meaningful source of competitive pressure. Doc. 41 ¶¶ 32-40, 175-76.

The FAC also alleges substantial overlap in use and customer base. Both branded and compounded GLP-1 medications are alleged to be prescribed to treat obesity and chronic weight management, and both are directed toward the same group of patients seeking GLP-1 therapy. *Id.* ¶¶ 54-55, 70-76, 182-89, 202-09. They are prescribed by the same physicians and reach patients through the same basic prescription process. *Id.* ¶¶ 61, 70-76, 86-89; *see also, e.g.*, *Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd.*, 838 F.3d 421, 438 (3d Cir. 2016) (recognizing market consisting of branded and generic oral tetracyclines prescribed to treat acne).

The FAC further alleges overlap in distribution and pricing dynamics. It alleges that telehealth providers historically served as a channel through which patients could access either branded or compounded GLP-1 medications. *Id.* ¶¶ 80-90. It also alleges that a substantial portion of cash-pay GLP-1 patients relied on

compounded products and that branded manufacturers responded to competition in that channel through direct-to-consumer discounting. *Id.* ¶¶ 98-111, 202-09; *see, e.g.*, *Geneva Pharms. v. Barr Labs. Inc.*, 386 F.3d 485, 497 (2d Cir. 2004) (recognizing that products compete where presence of one constrains the pricing of other, including by forcing substantial discounts and rebates). Taken together, those allegations support the conclusion that compounded and branded GLP-1 medications participate in the same competitive arena.

Most significantly, the FAC alleges direct evidence of competitive interaction. Novo Nordisk allegedly estimated that compounding pharmacies served roughly one-third of the cash-pay market and acknowledged that compounders "took part of our business away." *Id.* ¶¶ 98, 103. Eli Lilly likewise allegedly characterized Strive's business model as "divert[ing]" patients from branded GLP-1 medications. *Id.* ¶ 104. The FAC further alleges that Defendants entered agreements designed to exclude compounded products from telehealth channels responsible for a substantial share of cash-pay GLP-1 prescriptions. *Id.* ¶¶ 116-29. Viewed as a whole, those allegations plausibly support the conclusion that compounded and branded GLP-1 medications constrain one another competitively and belong in the same relevant market.

### 3. Market Definition Should Not Be Resolved on the Pleadings.

Whether a relevant market has been adequately defined is ordinarily a question of fact. *See RX Solutions, Inc. v. Caremark, L.L.C.*, 164 F.4th 436, 442 (5th Cir. 2026). Dismissal is appropriate when a complaint merely labels a market without alleging facts concerning interchangeability or cross-elasticity of demand. *Id.* at 443. That is what occurred in Defendants' much-cited *RX Solutions*. *Id.* ("Rx Solutions provides no explanation . . . . [the] complaint contains no allegations regarding reasonable interchangeability."). But that is not what occurred here.

As the Court itself recognized, the FAC alleges that branded and compounded GLP-1 products are prescribed for weight management, that compounders supplied demand for the same medications during a shortage period, that compounded products retained a meaningful share of the cash-pay GLP-1 market after the shortage ended, that Defendants lowered direct-to-patient prices, and that Defendants sought to exclude compounded products from telehealth channels accounting for a substantial portion of cash-pay GLP-1 prescriptions. Those allegations plausibly support substitution and competitive interaction. Defendants' alleged price reductions and exclusionary conduct, in particular, are consistent with viewing compounded GLP-1 products as a competitive constraint rather than a wholly separate category of products.

At minimum, the FAC's allegations make market definition a factual dispute. Whether compounded and branded GLP-1 products ultimately belong in the same market should be resolved on a developed factual record rather than at the pleading stage.

### C. Strive's Clayton Act Claims Should Be Reinstated For the Same Reason.

The Court dismissed Strive's Clayton Act Section 3 claims after concluding that it had not plausibly alleged that branded and compounded GLP-1 medications compete in the same line of commerce. Doc. 55 at 14–15. That conclusion depends on the same incorrect premise underlying the Court's antitrust analysis generally. Section 503A does not render competition between compounded and branded GLP-1 products legally impossible, and the FAC plausibly alleges substitution and competitive interaction between them. Accordingly, the FAC likewise plausibly alleges participation in the same line of commerce.

The FAC also alleges substantial foreclosure. According to the FAC, telehealth providers account for approximately half of cash-pay GLP-1 prescriptions, and

Defendants' agreements allegedly required those providers to stop working with compounding pharmacies. Doc. 41 ¶¶ 129, 222-23. The FAC further alleges that those arrangements excluded compounders from a significant avenue of distribution and foreclosed their ability to compete for cash-pay GLP-1 prescriptions. *Id.* ¶¶ 122, 129-37, 222-23.

At the pleading stage, those allegations plausibly identify both the affected channel of commerce and the share allegedly foreclosed. Because the Section 3 ruling rests on the same market-definition premise challenged above, reconsideration of that premise warrants reconsideration of the Clayton Act claims.

### D. Correcting the Market-Definition Analysis Also Requires Reconsideration of Antitrust Injury.

Just as with the Section 3 claims, the Court's antitrust injury analysis rests on the same premise underlying its market-definition ruling: that branded and compounded GLP-1 products do not compete in the same market. Doc. 55 at 14. But if, as the FAC plausibly alleges, branded and compounded GLP-1 products are reasonably interchangeable alternatives that compete for the same patients, prescriptions, and cash-pay demand, then the alleged harm extends beyond injury to Strive as an individual competitor.

Contrary to the Court's characterization, the FAC does not merely allege that Defendants denied Strive access to patients, reduced demand for its products, or otherwise harmed its ability to compete. Doc. 55 at 13. Instead, it alleges harm to the competitive process itself: Defendants' conduct reduced patient access to GLP-1 therapies, limited prescriber and patient choice, foreclosed rival suppliers from an important distribution channel, insulated branded products from lower-priced competition, and preserved supracompetitive prices in the cash-pay GLP-1 market. Doc. 41 ¶¶ 122, 129, 132-37, 195-201, 213-17, 224-31. The FAC thus alleges not merely that Strive lost sales or found it more difficult to compete, but that Defendants

restricted access to competing products and diminished the competitive constraints that compounded GLP-1 products otherwise impose on branded manufacturers. Cf. *Dr.'s Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 311 (5th Cir. 1997) ("[I]njury to a competitor can be some evidence of injury to competition.").

Those allegations closely track the types of injuries antitrust law recognizes as cognizable. Indeed, higher prices and reduced output are paradigmatic antitrust injuries because they reflect harm to marketwide competition rather than injury to a particular firm. *See Tesla, Inc. v. La. Auto. Dealers Ass'n*, 113 F.4th 511, 528 (5th Cir. 2024) (citing *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 261 (1972)).

The FAC further alleges that those injuries flowed directly from the conduct that allegedly makes Defendants' arrangements unlawful. *See Brunswick Corp. v. Pueblo-Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). According to the FAC, Defendants entered exclusive arrangements with national telehealth providers and required those providers to cease working with compounding pharmacies or facilitating prescriptions for compounded GLP-1 products. Doc. 41 ¶¶ 113-37. The FAC alleges that those arrangements foreclosed compounders from a major avenue of distribution, reduced the availability of competing products, limited patient and physician choice, and weakened price competition in the cash-pay GLP-1 market. *Id.* ¶¶ 122, 129-37, 195-201, 213-17, 224-31. Those injuries are not incidental to the alleged restraint. They are the direct and foreseeable anticompetitive effects of the exclusive arrangements alleged in the FAC.

Once the premise that compounded and branded GLP-1 products cannot compete is set aside, the FAC alleges far more than harm to a disappointed rival. It alleges that Defendants used exclusive arrangements to exclude competing suppliers, restrict consumer access to alternative products, and preserve supracompetitive pricing. That is precisely the type of injury the antitrust laws are designed to prevent.

Reconsideration is therefore warranted, and the Court should permit the case to proceed.

**E. At Minimum, Strive Should Be Granted Leave to Amend.**

Even if the Court declines to reconsider the dismissal, the Court should vacate the dismissal with prejudice and grant leave to amend. Rule 15 embodies a liberal amendment policy, and leave should be freely granted absent undue delay, bad faith, repeated failure to cure deficiencies, undue prejudice, or futility. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Marucci Sports, LLC v. NCAA*, 751 F.3d 368, 378 (5th Cir. 2014). The Fifth Circuit has likewise emphasized that plaintiffs ordinarily should receive at least one meaningful opportunity to cure pleading deficiencies before dismissal with prejudice. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329–30 (5th Cir. 2002); *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000).

None of those considerations support dismissal with prejudice here. In its decision, the Court identified perceived deficiencies in Strive's allegations concerning substitution, cross-elasticity, and injury to competition. It did not, however, find bad faith, repeated failure to cure deficiencies, or prejudice to Defendants. *Cf. Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 864–65 (5th Cir. 2003). Nor did the Court explain why amending the FAC would be futile. *Id.* Strive therefore had no opportunity to address the Court's concerns through amendment before judgment was entered.

Importantly, any amendment would not alter the nature of the case. Strive would continue to challenge the same agreements, involving the same products, markets, distribution channels, and competitive harms. The proposed amendment would provide additional factual allegations concerning: (1) physician prescribing decisions and the circumstances under which prescribers and patients choose between compounded and branded GLP-1 products; (2) substitution, diversion, and

demand responses arising from differences in price, availability, dosage, delivery method, and access; (3) Defendants' own recognition of competition from compounders, including admissions that compounders captured patients and demand; (4) the scope and significance of the telehealth distribution channel, including the share of cash-pay GLP-1 prescriptions affected by the challenged agreements; (5) the resulting effects on prices, output, access, and patient and prescriber choice; and (6) the distinction under Section 503A between patient-specific prescribing decisions and separate practitioner determinations regarding significant differences from commercially available products. *See* Ex. 1 (proposed Second Amended Complaint). Those asserted deficiencies were identified for the first time in the dismissal order, and the proposed amendment attached hereto is directed to those deficiencies.

The Federal Rules favor resolution of claims on their merits. *See Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 337 (5th Cir. 2017). Accordingly, if the Court declines to reinstate the FAC, it should vacate the dismissal with prejudice, and grant Strive leave to file its second amended complaint.

## CONCLUSION

For the foregoing reasons, Strive respectfully requests that the Court grant this motion; revise its August 3, 2026 Order pursuant to Rule 54(b) or, alternatively, Rule 59(e); vacate the dismissal with prejudice; reinstate Strive's Sherman Act and Clayton Act claims; or, alternatively, grant Strive leave under Rule 15(a)(2) to amend and deem the Second Amended Complaint attached as Ex. 1 filed as of the date of the Court's Order; and award such other relief as the Court deems just and proper.

Dated: August 21, 2026

By: */s/ Joshua J. Bennett*

**BAKER & HOSTETLER LLP**
Joshua J. Bennett
Texas Bar No. 24059444
2850 North Harwood Street
Suite 1100
Dallas, TX 75201-2640
Tel.: (214) 210-1200
jjbennett@bakerlaw.com

Timothy S. Longman (*pro hac vice*)
Matt Schock (*pro hac vice*)
1050 Connecticut Avenue NW
Suite 1100
Washington, DC 20036
Tel.: (202) 861-1530
tlongman@bakerlaw.com
mschock@bakerlaw.com

David M. Prichard
Texas Bar No. 16317900
dprichard@pomllp.com
David R. Montpas
Texas Bar No. 00794324
dmontpas@pomllp.com
**Prichard Oliver Montpas, LLP**
10101 Reunion Place, Suite 600
San Antonio, Texas 78216
Tel.: (210) 477-7400

*Attorneys for Plaintiff Strive Specialties Inc.*

## CERTIFICATE OF SERVICE

I certify that on August 21, 2026 I electronically filed the foregoing document(s) and that they are available for viewing and downloading from the Court's CM/ECF system, and that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By: *<u>/s/ Joshua J. Bennett</u>*

**BAKER & HOSTETLER LLP**
Joshua J. Bennett
Texas Bar No. 24059444
2850 North Harwood Street
Suite 1100
Dallas, TX 75201-2640
Tel.: (214) 210-1200
jjbennett@bakerlaw.com